KIERSTED *a*. THE PEOPLE OF THE STATE OF NEW YORK.

*Supreme Court, First District ; General Term, April,* 1855.

JURISDICTION. SUITS AGAINST A STATE.

There is no power in any of the Courts of this State, to entertain a suit brought against the State itself except as authorized by statute.

Demurrer to complaint.

This action was brought by the plaintiff Kiersted on behalf of himself and such other of the persons interested in the controversy, as should come in, against the People of the State of New York, and the Rector, &c. of Trinity Church.

The allegations of the complaint, and the grounds of the demurrer, appear in the opinion of the Court.

*The Attorney General and others*, in support of the demurrer.

*Mr. Sullivan*, opposed.

MITCHELL, J.—The complaint contains substantially the following statements.

Anneke Jants being seized of the lands now held by Trinity Church, in 1663 made her will, and devised the same to her children, from one of whom the plaintiff derives his title as an heir at law. On March 27, 1667, the title to the lands was confirmed to the children and heirs of Anneke Jants by R. Nicolls, governor of the then colony of New York. The children and heirs entered and continued to have possession, until the Duke of York, exercising the royal prerogative of the crown of England, assumed possession of the lands during their absence from the island (now city) of New York; but such possession by him, was assumed only for the purpose of maintaining and preserving the rights of possession of the heirs, according to the laws of England then in force in the colony. On March 25, 1677, the governor leased the lands to one Senkness for twenty years. On 6 February, 1685, the

25

Duke of York, proprietor of the then colony of New York, became king of England, and these lands were thereafter known as the king's farm. On August 19, 1697, Governor Fletcher (as governor under William III.) leased the lands to Trinity Church for seven years, describing them in the lease executed in the name of the king, "as our farm, known as the king's farm." On May 12, 1699, a colonial act was passed, annulling this and other leases as extravagant, and declaring that no governor should lease for a longer period than his own term of office, "the king's farm, and certain other specified lands, being for the benefit and accommodation of his majesty's governors, and commanders in chief for the time being." On May 9, 1702, Governor Cornbury leased the lands of Trinity Church so long as he should continue to be governor. The Church held over under the lease under Governor Lovelace and the successive governors, until the British evacuated the city of New York on November 25, 1783. In the reign of George II. in 1730, 1731, 1732, these lands were expressly recognized as the "king's farm," and were then reserved for the use of the governors and officers of the crown in the province; the Montgomery and Dongan charters reserving from the grant of lands to the city, "the king's farm."

The plaintiff alleges that there was an obligation legal and equitable on the successive kings of England to restore the possession to the heirs of his ancestor, and that this obligation has devolved on the State of New York. That the church pretends to hold under what purports to be a grant in fee from Lord Cornbury, made November 23, 1705, but that the grant is void and could not be made on account of the act of May 12, 1699.

The plaintiff demands that the State be required to demand possession of the lands from the church, and an account from the church of all moneys received by it since the year 1783, and that the State render possession of the lands to the said heirs by proper conveyances; and that *if the State make default*, the church be required to do the same things; and that a receiver be appointed and an injunction be granted.

For nearly eighty years, the people of the State of New York have been independent, and if liable to be sued in their

own courts, might have been sued within that time. Yet no other instance is known in which a suit was ever before commenced against them in their own tribunals, unless when they had specially authorized the suit, or they or their Attorney General were made parties in an equity suit with other defendants on account of some lien or claim held by the State *avowedly* subject to the prior claim of another. Then they were made co-defendants, not to defeat their claim, or to compel them to do justice, but to give them the opportunity (if they chose) to come in and protect their rights. No process issued against the people, but the complaint prayed for leave to serve the Attorney General with a copy of the bill, that he might answer or let the bill be taken as confessed. If such a suit as this had been sustainable, it is remarkable that it was not resorted to before. It was generally considered an axiom that the people could not be sued in their own tribunals, and the cases in which they were made parties to suits, or in which the king of England allowed an investigation of claims against property held by him to be prosecuted in certain courts, were deemed from their peculiarities as hardly exceptions to the rule. Blackstone says, "if any person has in point of property a just demand upon the king, he must petition him in his high court of chancery when Chancellor will administer right as a matter of *grace*, though not upon compulsion," and quotes Puffendorf, "that a subject hath no way to *oblige* his prince to give him his due, and if the prince gives him leave to enter an action against him in his own courts, it proceeds rather upon *natural equity* than upon the *municipal law*." For the end of such action is not to *compel* the prince to observe the contract, but to *persuade* him. (1 *Bl. Com.*, 243). Our State has no courts which administer law as a matter of grace and not of right, or which have a jurisdiction to persuade and not to compel those who appear before them.

The practice under the *petition de droit* or *monstrans de droit* was referred to by the plaintiff as applicable to this case, and it was insisted that the king held these lands subject to the right of the heirs and subject to have that right protected by means of one of those remedies; and that the lands devolved on the State, subject to the same rights, the same obligations

and remedies, and that these remedies were usually prosecuted before the chancellor in England and passed to this court, although in the form modified by the code.

Blackstone, in treating of the modes of redress for injuries proceeding from the crown, says expressly, "*no action* will lie against the sovereign, for who shall command the king. Yet the law has furnished the subject with a decent and respectful mode of redress by *informing the king* of the matter in dispute." (3 *Bl. Com.*, 255). This is done by *petition de droit* or *monstrans de droit*. But to obtain either of these remedies, application must be made to the king, and in any such case there is no jurisdiction in any of the courts to proceed, until the king indorses his order in that particular case. By such act, the king (who formerly constituted the court) submits himself voluntarily in each case to the decision of the tribunal to which the case may be referred, whether to the barons of the exchequer as in the banker's case (5 *Mod.*, 29 and 14 *How.* State trials, 7) or to the king's bench if it be referred to them to examine the matter, or to the chancellor if the direction be simply *soit droit fait al partie*, (see *Vin. Abr. Prerog.* 2. Opinion of Iredell, J., in 2 *Dallas*, 444). Here that permission to the courts is wanting, and our legislature, which alone has power to surrender the custody and ownership of lands held by the people, and to give to the courts authority to take cognizance of a suit directly against the people, has conferred no such power on the State courts. They have not had any petition that " right be done" presented to them in this case, nor given to this court power to exercise jurisdiction over the people.

It is said the act of April 15, 1854, (ch. 280) gives this jurisdiction, but the demurrer in this case had been interposed by the people before that act was passed, and it only authorized that suit to have a preference on the calendar, and gave a like preference to any other suits which the Attorney General might deem it expedient to prosecute to enforce the *rights of the State* against this plaintiff or the church or other claimants. It cut off no defence that the State might make to this suit, and one of these defences is that the State cannot be thus sued.

There were reasons for allowing judicial tribunals to pass on

the right of the king to property held by him and claimed by another which would not apply to the State. He held such property as an *individual.* At one time his individual property must have formed the greatest part of his resources, and his supplies from Parliament were comparatively small and given seldom and grudgingly. This individual property was added to by attainders, forfeitures and escheats, whether for crimes or default of heirs of former owners or other causes. His title to these new acquisitions was found by inquisition, where the true owners would generally have no opportunity of being heard, and the king might thus frequently become the possessor of lands as forfeited to him by the fault or misfortune of one who had had no title or only a defeasible one and the true title was in another.

When forfeitures were frequent it must have been essential to the safety of the crown that it should allow " right to be done" to such parties, although the crown by its officers had laid its hands on their lands. But if the title to those lands or other property held by the king had passed to the State in England, so that he ceased to hold them and Parliament had the control over them, can it be imagined that, after that, the *petition de droit* would be applicable, and that the English Parliament, or the English people could be sued in their own courts on the king's order, or even without his consent? If the English legislature and the English people could not be sued in such case, neither can the people of our own State. And if, as is assumed, the people can be sued whenever the king could be proceeded against on *petition de droit* or *monstrans de droit,* then every State (where the common law prevails) can be sued on its obligations, when it has pledged certain revenues to meet them; for it was held in the Banker's case that the king could be thus proceeded against in such a case (see above). Such a doctrine would be equally new and startling. Those who have claims upon the State rely upon the public faith; and self-interest and a sense of honor and of right have been yet generally found sufficient means of securing justice to claimants against the State.

A brief reference to parts of the history of our own law will show how tenacious the States have been of their rights on this

subject. The constitution of the United States declared that the judicial power of the United States should extend among other matters to controversies between two or more States, and between a State and citizens of another State (*Art* 3, § 2). Under this power, suits were brought in the United States Court of citizens of another State, against the State of Maryland in 1791, (2 *Dallas*, 401) and by another against the State of New York (*ib.*) and by another against the State of Georgia in 1793 (2 *ib.* 419) and by another against the State of Virginia (3 *ib.* 320). Georgia and Virginia protested against the exercise of this jurisdiction, and Georgia refused to appear in Court except to make its protest. Judge Iredell insisted in an able and learned opinion that the Court had no jurisdiction in such an action, which was on a contract. Chief Justice Jay with Justices Blair, Wilson and Cushing, held that the words of the constitution clearly conferred the jurisdiction, and they ordered that unless the State of Georgia should appear by a certain day or show cause to the contrary, judgment should pass by default;—but Chief Justice Jay dreading the consequences of the decision, said he was far from being prepared to say that an individual may sue a State on bills of credit *issued before the constitution was established.* He probably would have been as little prepared to allow the suit on a claim to lands when the right had also existed before the constitution was established. This decision was necessary under the words of the constitution; it was made in 1793, and (as we are told in 3 *Dallas*, 378) it produced the proposition in congress for amending that article of the constitution, and it was promptly amended by the requisite number of States, so that "it should not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." The people thus declared their sovereign will that while a State might sue, it should not be sued by an individual in the United States Court, the only courts which ever had any express authority to entertain such a suit. And the Supreme Court of the United States so readily assented to this expression of the will of the States, that they unanimously held that it applied even to suits then pending, and refused to

proceed further in any such suits, (Hollingsworth *v.* State of Virginia, 3 *Dallas*, 382).

In our State no general power has ever been given to any court to entertain a suit against the State, but the legislature has, by special legislation, pointed out in the cases and manner in which it would allow the title to property held by it to be contested, and as it has thus given the permission in a few special cases only, it shows that it was not intended that the permission should extend to other cases. The Revised Statutes (1 *Rev. Stats.*, 718, § 2), declare that all escheated lands, when held by the State or its grantors, shall be subject to the same trusts, incumbrances, charges, rents and services to which they would have been subject had they descended; and the Court of Chancery shall have power to direct *the Attorney General* to *convey* such lands to the parties equitably entitled thereto, according to their respective rights, or to such new trustee as may be appointed by such Court. The Revisers give the reason for this law; they say (3 *R. S.*, 563), "By the common law, lands held in trust, if they escheat to the king, are held by him, *free from the trust.* The same doctrine would probably be applied to the people of this State. This severe rule has in part been remedied in England by the act of 47, *Geo.* 3, c. 29, and it is presumed that the legislature of this State *will be* equally ready to amend the law in this particular." So even if these lands had escheated for default of heirs of the trustee, the people would have held them discharged of the trust; and now where they amend the law in that respect they confine the amendment to the case of escheated lands, and make the remedy to be not in suit against the State, but in the chancellor's directing the *Attorney General* to convey the lands to the parties equitably entitled.

So the Revised Statutes also allow the same proceedings to be had against the State for the partition of lands held by the State, and by individuals in common in the same manner as in suit against individuals, (2 *Rev. Stats.*, 331 § 99).

So it required an express Statute to subject the people to costs, or to make the Statute of limitations a bar to their claims (see 2 *Rev. Stats.*, 552, § 13 or 292, § 1). The provision for costs to be paid by the people, is only when the people are

plaintiffs, not when the people are defendants; showing that the latter was a case not supposed or supposable, except when it was specially allowed.

The direct authorities on the subject are few, because it is seldom that the question can arise. In Delafield v. the State of Illinois, on appeal in the Court for the Correction of Errors, (2 *Hill*, 159) the counsel for the appellant had contended that the State could not sue in a State court; but Bronson, Chief Justice, successfully controverted this position, and in the course of his opinion (p. 169) said, " When a State is made *defendant* the *State courts cannot* exercise jurisdiction." In the same case (8 *Paige* 533), the chancellor had said, " The State cannot indeed be sued by any private individual or corporation." It therefore may be impossible to coerce a payment by any legal process, unless the stock should come into the possession of a sovereign state," &c. The Chancellor, in a subsequent case, explained with his usual clearness, the principle on which a State ever is made a defendant in a State court. In Garr v. Bright (1 *Barb. Ch. R.* 163), he says, " It is true this court has not the power absolutely to compel a sovereign State to perform a decree which may be made against such State. And if the State of Indiana should be made a party defendant in this suit, it would not be with *any expectation of compelling it* to transfer to the complainant the stock standing in its name upon the books of the Apalachicola Land Company. But it would be to enable the State to appear and protect its right, if it has any, as one of the *cestuis que trust*, in the proceeds of the land of that association, which lands are vested in some of the *other defendants* in this suit as trustees for the stockholders, so that such trustees may be protected from the risk and expense of a double litigation with those who have conflicting claims upon the trust fund. And upon the same principle the Attorney General would be made a party to the suit, if the people of this State claimed an interest as one of the *cestuis que trust*, and the complainant was asking similiar relief against the trustees as the claimant of the same interest; although *the State itself cannot be sued in its own Courts directly*. It is also the practice to make the Attorney General a party to a foreclosure suit, when the

people of this State have a subsequent lien upon the mortgaged premises, by judgment or otherwise, so as to give to the purchaser under the decree of foreclosure, a perfect title to the premises discharged of the lien of the State, and when any other State or government has a similar lien, I see no valid objection to making it a party defendant for the same purpose."

Here the complaint shows that the king leased these lands as the king's own lands, and reserved rent on them for the use of the Governors for the time being, and that the lands were known as the King's farm, and as such leased to the church; —and asks for direct relief against the people—that the people be compelled to demand possession of the lands from the church, and an account of the rents, and to render to the plaintiff, and other heirs, the possession of the premises; and only asks relief against the church if the People make default. The action is therefore directly against the people, and only against the church if the people make default. The people do not make default. There is thus no course of action against the church, as that sought against it is only secondary to that sought against the State.

The nature of the relief sought is extraordinary, no trust estate being alleged and the application to a Court, and not to the Legislature to require the State to act, is still more extraordinary.

Judgment should be for the defendants with costs.

---

## QUINTARD *a.* SECOR.

*New York Common Pleas ; Special Term, April,* 1855.

ADMISSION OF PART OF PLAINTIFF'S CLAIM.—SATISFACTION.

The power of the court to order the satisfaction of a part of plaintiff's claim admitted to be just, under § 244 of the Code, is not confined to cases in which one, or more, of several distinct items of claim is admitted in the precise extent in which it is set up ; but such an order may be made where a part of a sum claimed, is admitted to be due.

A concession in the answer that not more than a specified sum was due to the plaintiff,—*Held,* an admission that that sum was due, and so an admission of part of plaintiff's claim.