RYNEAR VAN GIESSEN, Appellant, etc., *v.* SAMUEL BRIDG-FORD, Respondent.

Where, upon application for letters of administration with the will annexed, it appears that there are no assets, or the presumption arises from lapse of time that there are no assets of the testator in existence which can be identified and reached by the administrator, and there is no claim in respect to them which can be enforced, and no other reason appears, the granting of letters cannot be claimed as a matter of right, and the application may be properly refused.

B. died in 1663, in the (now) county of Albany, leaving a will of real and personal estate. By the will her children and grand-children were nominated and instituted as "her sole and universal heirs;" no person was named as executor. On application to the surrogate of said county for letters of administration with the will annexed, the applicant presented a certificate of the clerk of the Court of Appeals to the effect, that upon examination of the records, etc., of the former Court of Prerogatives and Court of Probate, he was unable to find any record of letters of administration on the estate of B. The oldest of these courts had no existence until over twenty years after the death of B. Also, a certificate of the clerk of Albany county, that no record of such letters could be found in his office. Proof was given of conveyances by the heirs and those claiming to represent them, of real estate of which B. died seized. A family Bible and a pair of ear-rings were produced by a witness who testified in substance, that her mother was a descendant of B.; that the articles produced came to her mother from a son of B., and that her mother told her that the Bible was once owned by B. *Held,* that the application was properly denied; that it may and should be presumed that administration had been had of the estate, or that the rights and interests of all the parties interested had been satisfactorily adjusted between them, as when the testator died there were courts in the New Netherlands (which embraced what is now the city of Albany) having probate jurisdiction, which jurisdiction has been continued from that time down in those and other courts; that the certificates produced did not rebut such presumption. Also, that as the evidence tended to show that the instituted heirs accepted the inheritance, having executed conveyances of the real estate, and as according to the civil law then in force, the said heirs became, upon such acceptance, absolutely bound to pay debts and perform the directions of the will, after the lapse of two centuries the surrogate was not only justified in deciding, but was bound to decide, that the will had been executed, and that there were no goods, etc., unadministered.

The will directed that the "four first born children" of the testator "shall divide out of their father's property the sum of one thousand guilders, to be paid by them out of the proceeds of a certain farm * * * before any other division takes place." *Held,* that this did not work an equitable conversion of the farm from real estate into personalty; that the distinction in the English law between the descent of real and the distribution of personal estate, upon which the doctrine of equitable conversion was founded, did not exist in the law which prevailed in New Netherlands at the time the will was made; also, that the effect of the provision was simply to create a charge upon the land in the hands of the devisees; and that assuming that by implication a power and duty was imposed on the "universal heirs" to sell, this power would not devolve upon an administrator with the will annexed.

(Argued December 1, 1880; decided January 18, 1881.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, entered upon an order made at the May term, 1879, affirming an order of the surrogate of Albany county, denying an application for letters of administration, with the will annexed, of the goods, etc., of Anneke Jantz Bogardus, deceased. (Reported below, 18 Hun, 80.)

The facts are set forth sufficiently in the opinion.

*J. J. Perry* for appellant. A surrogate cannot determine the question of limitation and lapse of time; nor whether it has barred the remedy to recover alleged unadministered assets; or whether the proposed administrator with the will annexed would have any legal or equitable cause of action for the benefit of the estate. (Redfield's Surr. Pr. 151; *Pumpelly* v. *Tinkham*, 23 Barb. 321.) Section 22 of 2 Revised Statutes, 72, gives full power to an administrator with the will annexed to do and act as an executor named, and such power is fully supported by authorities. (*Dominick* v. *Michael*, 4 Sandf. 374; *Beekman* v. *Bonsor*, 23 N. Y. 298.) As to other property besides the two pieces of real estate specifically mentioned by the testatrix, the will must be construed as a whole, and the intent derived therefrom. (*Taylor* v. *Dodd et al.*, 2 T. & C. 88; *Thurmway* v. *Harmon*, 4 Hun, 411; *Moncrief* v. *Ross*, 50 N. Y. 431; *Hayes* v. *Gourley*, *admr.*, 3 T. & C. 115.) To confer jurisdiction upon a surrogate for the purpose of letters of administration with the will annexed, the value of property is merely nominal, and *prima facie* evidence of assets is sufficient. (*Sullivan* v. *Fosdick*, 10 Hun, 173; *Rugan* v. *Allen et al.*, 7 id. 537; *Tracy* v. *Tracy*, 15 Barb. 503; *The Roman Catholic Church* v. *Wachter*, 42 id. 43; Hill. on Trustees, 360.) When an executor or administrator is appointed, his powers and jurisdiction relate back to the time of the death of the deceased, and all property of which he had possession, or which rightly belonged to his estate at that time, would vest in the executor or administrator. (*Allen*

v. *Eighmie,* 9 Hun, 201; *Vroome* v. *Van Horne,* 10 Paige, 549; *Sullivan* v. *Fosdick,* 10 Hun, 173.)

*Charles T. F. Spoor* for respondent. The petition for letters of administration, with the will annexed, must show such a state of facts as would authorize the granting of letters of administration on the estate of the deceased, if it were shown that she had died intestate. (Dayton on Surrogates, 249; 3 R. S. [5th ed.] 158, § 23; 5 N. Y. 497.) From the lapse of time, the court must presume that what ought to have been done in the carrying out of the will of the testatrix was done, and that its provisions were carried out, or a satisfactory settlement of the estate had between the heirs. (1 Col. Doc. of New York; Daly's Historical Sketch of the Judicial Tribunals of New York, prefixed to E. D. Smith's; *Matter of Brick's Estate,* 15 Abb. Pr. 18, 21; 1 Laws of New York [Jones & Varick's ed.], 23; 2 id. 71.) The heirs of the testatrix, under the Dutch law prevailing in the province of New Netherlands at the time of her death, were her executors. (Daly's Historical Sketch, pp. 26, 28; *Matter of Brick's Estate,* 15 Abb. Pr. 17; 2 Domat's Civil Law [Cushing's ed.], 432, §§ 3330–3332; Grotius' Dutch Juris. 120, § 7; Van Leeuwen's Commentaries on the Roman-Dutch Law, pp. 243, 244, §§ 1, 3; Translator's Preface to Van Der Linden's Institutes; 18 Hun, 80; Daly's Historical Sketch; 1 E. D. Smith, 17, 26.) The doctrine of equitable conversion, invoked by the appellant in the court below, to show personal property remaining unadministered, as a foundation for this application, does not apply. (2 Ves. 184; 26 Barb. 224; 7 N. Y. 242; *Reed* v. *Reed,* 12 Barb. 113; *Murray* v. *Murray,* 2 Ch. Sent. 23.)

ANDREWS, J. The appellant claiming to be a descendant (of the seventh generation) of Anneke Jantz Bogardus, who died in the village of Beverwyck (within the present city and county of Albany), on or about the 19th day of March, 1663, presented his petition to the surrogate of the county of Albany on the 18th day of July, 1877, praying that letters of adminis-

tration, with the will annexed, of the goods, chattels and cred-
its of the said Anneke Jantz Bogardus, left unadministered,
be granted to the petitioner. The petitioner alleged in his
petition the death of Anneke Jantz Bogardus, leaving a will of
real and personal estate, executed on the 29th day of January,
1663, a copy of which was annexed to the petition.

By her will the testatrix nominated and instituted "as her
sole and universal heirs" her six children living, and two
children of a deceased daughter, "representing together their
mother's place," and gave and bequeathed to them all her
real estate, chattels, credits, money, gold and silver (coined
and uncoined), jewels, clothes, linen, woolen, household furni-
ture, and all property whatsoever, "to be disposed of after her
decease, and divided by them in equal shares, to do with the
same at their own will and pleasure, without any hindrance
whatsoever," subject, however, to the following direction, viz.:
"that her four first born children shall divide, out of their
father's property, the sum of one thousand guilders, to be paid
to them out of the proceeds of a certain farm, situate on Man-
hattan Island, and that, before any other division takes place;"
that Jan Roelofson shall "receive a bed and milks cow;"
Jonas and Peter Bogardus a house and lot in the village of
Beverwyck, besides a bed and milch cow each; and each of four
grandchildren (named) a silver mug; "all the above donations
to be provided for out of the first moneys received, and after-
ward the remainder of the property to be divided and shared
as aforesaid."

No person was named as executor in the will. It was
alleged in the petition that of the goods, etc., mentioned
in the will, there yet remain, to the best of the petitioner's
knowledge and belief, a family Bible and other chattels undi-
vided, and that Anneke Jantz Bogardus died seized and pos-
sessed of certain goods and chattels "hereinbefore" (in the
will) "set forth," together with other personal property to a
large amount, and a large amount of real estate, situate in the
(now) cities of New York and Albany and elsewhere, and that
no administration of the estate of the decedent has ever been

had. Upon the presentation of the petition, the surrogate issued a citation to the persons named therein as next of kin of the testatrix, and upon the return of the citation the respondent (also claiming to be a descendant of the testatrix, of the fifth generation) appeared before the surrogate, and filed objections to the granting of the petition, and the surrogate afterward proceeded to hear the proofs of the parties.

The death of Anneke Jantz Bogardus at Beverwyck in 1663 was admitted. The petitioner offered in evidence (1) a certified copy of the will of the decedent, certified by the clerk of Albany county, as a copy of the original, recorded in his office "in Notarial Papers 1660–1676, p. 296;" (2) A certified copy of a patent granted by Governor Nicolls, March 27, 1667, confirming "unto ye children and heirs of the sd. Anneke Bogardus in their possession and enjoyment of the premises," a certain parcel of land "on the island Manhattans toward the North river," containing about sixty-two acres, theretofore (as recited) patented to Anneke Jantz, July 4, 1654, by "the Dutch governor, Peter Stuyvesant;" (3) A certified copy of a similar patent of the same date, confirming the title of the heirs to one hundred and thirty acres, "near Mespat's mills, upon a neck of land commonly called Dominie's Hook;" (4) A certified copy of a similar patent, dated July 10, 1667, confirming "unto ye heirs of ye said Annette Bogardus" a lot "lying near ye fort at Albany;" (5) A certificate of the clerk of the Court of Appeals, certifying that upon examination of wills, letters of administration and other files and records of the former Court of Prerogatives and Court of Probate, he was unable to find any record of letters of administration granted upon the estate of Anneke Bogardus, and a certificate by the clerk of Albany county, that no record of such letters could be found in his office.

The respondent offered in evidence, (1) a bill of sale (so called) by the heirs of "Annetian Bogardus," dated June 21, 1663, to Dirk Wesselse, of "their late mother's" house and lot in Beverwyck, for one thousand guilders, "payable in good merchantable beaver skins at eight guilders a piece," executed

by three of the children of the testatrix for themselves, "and by order of the other heirs," and also by the purchaser; (2) a deed to Dirk Wesselse of the same premises, dated July 27, 1667, purporting to be executed by Peter Bogardus and Jonas Bogardus for themselves, and as attorneys for the children and heirs of their mother, which deed acknowledged payment in full of the contract of June 21, 1663, and contains a covenant by the grantors to protect the title of the grantee; " and further, never to do nor suffer any thing to be done against the same, either with or without law, in any manner, on pledge of person and estate, nothing excepted, subject to all laws and judges."

In addition to the documentary evidence above stated, a family Bible and a pair of gold ear-rings were produced by a witness called by the appellant, who testified that her ancestors on her mother's side were named Bogardus; that the family Bible and ear-rings came to her mother from her ancestors; that the Bible came down to her mother from Peter Bogardus, a son of Anneke Bogardus, and that her mother said the Bible was once owned by Anneke Jantz Bogardus. Upon these proofs the case was submitted to the surrogate, who made an order denying the appellant's application, and on appeal to the General Term the order was affirmed, and from the order of affirmance this appeal is taken.

The statute (2 R. S. 73, § 23) confers upon the surrogate of each county exclusive jurisdiction within his county to grant letters of administration of the goods, chattels and credits of persons dying intestate, in cases (among others) where the intestate at or immediately preceding his death was an inhabitant of the county of such surrogate, and provision is also made for granting letters of administration with the will annexed in the cases specified in 2 R. S. 71, § 14. The cases specified in section 14 do not seem to include the case where no executors are named in the will, but it was stated by DUER, J., in *Dominick* v. *Michael* (4 Sandf. 415), that the power of the surrogate extended to such a case, and this jurisdiction is understood to have been generally

exercised by surrogates' courts. But the power to issue let-ters of administration of the goods, chattels and credits of a decedent generally presupposes the existence of assets left by the decedent to be administered, and that administration has not already been had. There may be cases where letters of ad-ministration are necessary to be granted for other purposes than the recovery and distribution of assets, and we do not intend to say that the existence of assets is essential to the jurisdiction of the surrogate to grant letters of administra-tion. But when it appears that there are no assets, or the presumption arises from lapse of time that there are no assets in existence which can be identified or reached by an adminis-trator, and no claim in respect to them which can be en-forced, and no other reason for issuing letters appears, the granting of letters cannot, we think, be claimed as a legal right, and the application therefor may be properly refused. In this case, however probable it may be that Anneke Jantz left per-sonal assets at her death, there is no legal proof that she did so. It is true that she bequeathes personal property by her will, but the recital in the will is not legal evidence of the fact that she owned personal property at her death, and in respect to the family Bible and ear-rings, the evidence only goes .to the extent of showing a tradition in the family that these articles were once owned by her, but the tradition is equally consistent with the supposition that she disposed of them before her death, as that she had them at that time.

It is claimed that the provision in the will that the four first .born children should be paid one thousand guilders out of the proceeds of the farm on Manhattan Island, before any other dividend is made, worked an equitable conversion of the farm from real estate into personalty, and upon this fiction of courts of equity, counsel bases an argument that the farm is to be treated as personal assets left by the testatrix. There are sev-eral answers to this claim. The doctrine of equitable con-version is a doctrine of English equity law, and was not gen-erally acted upon or recognized by the English courts until about the time of Charles II. (Leigh & Dalzell on Eq. Con. p. 2.)

The doctrine grew up in part at least in consequence of the difference in the rules of the English law, governing the descent of real, and the distribution of personal property, a distinction which did not exist in the Roman-Dutch law which prevailed in the New Netherlands at the time the will in question was made. But the effect of the direction in the will that the four children mentioned should be paid a thousand guilders out of the proceeds of the Manhattan farm was simply, we think, to create a charge on the land in the hands of the devisees to be enforced under our system by an action by the beneficiaries, or their representatives. There was no executor named in the will, and no express power was conferred upon any one to sell the land to pay the four children named, the one thousand guilders. But assuming that by implication a power and duty was imposed on the "universal heirs" to sell the Manhattan farm to pay the charge, this power would not devolve upon an administrator with the will annexed, according to the authorities, and there is, therefore, no reason founded upon this provision of the will for granting letters of administration. (*Conklin* v. *Egerton's Admr.*, 21 Wend. 430; *S. C.*, 25 id. 224; *Roome* v. *Philips*, 27 N. Y. 357; *Dominick* v. *Michael*, 4 Sandf. 374. 1 Rev. Stat. 734, § 1.)

But we think the order of the surrogate should be sustained for another reason, viz.: That it may and should be presumed that administration had been had of the estate of Anneke Jantz, and the estate settled in the courts of the time, or in the alternative that the rights and interests of all the parties interested were satisfactorily adjusted between themselves.

When the testatrix died there were courts in the New Netherlands (which embraced the present city of Albany), having probate jurisdiction, and jurisdiction to settle the estates of decedents. And after 1664, when the New Netherlands came under the power of England, the existing courts were continued or other courts with similar jurisdiction were instituted, and later and subsequent to 1686, the prerogative court, having probate jurisdiction in the colony of New York, was established, which

continued until 1778, when it was abolished and the court of probates instituted in its stead, and in 1787, probate jurisdiction of wills and of administration of estates of decedents was taken away from the court of probates and given to the surrogates of the different counties, where it has since remained. The history of these various courts will be found in the very learned and valuable monograph of Chief Justice DALY, of the New York Common Pleas, prefixed to 1st E. D. Smith's Reports. Most of the records of these early courts of two centuries ago are destroyed or cannot be found, and doubtless the proceedings were often quite informal. But (if necessary) it ought to be assumed, in the absence of proof to the contrary, that the parties interested in the estate of Anneke Jantz, resorted to the courts for the settlement of what is claimed to have been the large estate of their ancestor, and that their rights were duly adjusted therein. The fact that no record can be found in the office of the clerk of this court of letters of administration granted by the prerogative, or the probate courts (the earliest of which had no existence until more than twenty years after the death of Anneke Jantz), do not rebut the presumption that the estate was settled by proper judicial proceedings, and no reason is shown for supposing that the early records of administration would be found in the clerk's office of Albany county.

Again, the documentary evidence tends to show that the *instituted* heirs accepted the inheritance. They entered into the contract with Dirk Wesselse, a few months after their mother's death, and conveyed in pursuance thereof in 1667. In 1667 they (as must be presumed) procured and accepted confirmations to them jointly of their mother's title to the lands owned by her, including the farm on Manhattan Island. According to the civil law the universal or *instituted* heir (who was the general heir appointed by the will of a testator) becomes, upon acceptance of the inheritance, absolutely bound to discharge the debts of the testator and to pay the legacies, and perform the directions of the will. He is both heir and executor. (Domat's Civil Law [Cush. ed.], §§ 2462, 2470, 2595,

3649; Van Leeuwen's Commentaries on the Roman-Dutch Law, B. 3, chap. 10, § 3; Inst. B. 2, tit. 10, § 10.) The heirs of Anneke Jantz were, therefore, bound to pay all the legacies given by her will, and after the lapse of two hundred years, and in view of the fact that the legatees had an interest in having this duty discharged, the surrogate was, we think, not only justified in deciding, but in the exercise of a fair judgment was bound to decide that the will had been executed, and that there were no goods, chattels or credits of Anneke Jantz unadministered.

The judgment should be affirmed.

All concur.

Judgment affirmed.