In the Matter of WILLIS T. GRIDLEY, an Attorney, Respondent.

First Department, October 26, 1917.

**Attorney at law disbarred — solicitation of contributions to finance investigation knowing there was no chance of success — title to property of Trinity Church in the city of New York.**

Attorney at law disbarred for taking part in soliciting contributions indiscriminately towards defraying his expenses of alleged investigations made and to be made by him as to the validity of the title to the property owned by Trinity Church in the city of New York, although he knew that there was no chance of success, and had no new information and was unable to advance any theory upon which probable success could be based, which had not already been advanced to and been disposed of by the courts. History of litigation as to title to property of Trinity Church stated.

DISCIPLINARY proceeding instituted by the Association of the Bar of the City of New York.

*Einar Chrystie* [*John G. Jackson* of counsel], for the petitioner.

*Willis T. Gridley*, respondent, in person.

CLARKE, P. J.:

The respondent was admitted to the bar in February, 1893. The charges contained in the petition are, in sub-

First Department, October, 1917. [Vol. 179.

stance, that the respondent caused circular letters to be sent to a large number of supposed heirs of one Anneke Jans Bogardus, representing to them, although he knew the representations to be false, that as such heirs they had valid claims of immense value against the land held by the corporation of Trinity Church in New York city, and soliciting from them money for the alleged purpose of financing an investigation of said claims; and in particular, that in November, 1914, he falsely represented to one Calligari that he believed the said claims to be valid and that their prosecution would result in the recovery from the corporation of several million dollars, and thereby induced Calligari, relying upon said representations, to influence a fellow-countryman to agree to invest $25,000 in the project and pay said sum to the respondent, and then prepared a written agreement for the intending investor and himself to sign. This proposed agreement, after reciting that the respondent had been retained in the matter, that he desired the necessary funds to conduct the investigation, and that lucrative fees would be derived by an attorney who successfully enforced the claims of the descendants of Anneke Jans Bogardus, contained the provision that the respondent would pay the person advancing the money five per cent of all fees, benefits, percentages and amounts which he might receive or recover as a result of the investigation, except that he would not be obliged to pay the investor more than $300,000, but that the investor would be entitled in any event to $300,000. The respondent agreed further not to enter any suit or action or begin any proceeding until he had first been retained by all the descendants of Anneke Jans Bogardus by agreements providing for at least ten per cent as a fee to be paid and received by respondent for his services.

The charge then further is that the respondent at the time he prepared the agreement knew that it would be impossible for him to obtain agreements from all of the so-called descendants of Anneke Jans Bogardus and that before the intending investor signed the agreement he obtained information which caused him to decline to enter into the agreement.

A consideration of the charges thus presented requires an

examination of the history of the title to the lands in question and a review of the decisions of the courts of this State in which Trinity's ownership had been unsuccessfully assailed. The adjudicated cases show that about the year 1633 or 1636, one Anneke Jans Bogardus owned a farm on the island of Manhattan and that she died about the year 1663, leaving a will. In 1667, the then Governor, Nicholls, confirmed the title of this and other property in her· children and heirs. In March, 1670, some of the heirs executed an instrument known as a " transport " conveying the said farm in fee to Colonel Francis Lovelace, then Governor of the Province of New York. This farm, with other lands held by or for the Crown, was known at different times as the Duke's farm, the King's farm and the Queen's farm.

Trinity Church was incorporated by royal charter in 1697, and in the same year the then Governor, Fletcher, executed a lease of the farm to the corporation for a term of seven years. Subsequently, in 1705, Queen Anne granted to the church the property on Manhattan Island described in the grant as " bounded on the East partly by the Broadway, partly by the Common, and partly by the Swamp, and on the West by Hudson's River, and also all that other piece or parcel of ground situate and being on the South Side of the Church Yard of Trinity Church, aforesaid, commonly called and known by the name of Queens Garden, fronting to the said Broadway on the East, and extending to the low water mark upon Hudson River on the West." The corporation thereafter remained in possession of this property under claim of title from the Crown, and its present holdings are under such grant. With this brief historical outline of the title, we may turn to a consideration of the attempts of the Bogardus heirs, and on one occasion, the State, to establish title to said lands as against the corporation.

The earliest reported decision is that of *Bogardus* v. *Trinity Church* (4 Paige, 178) decided in 1833. The complainant therein claimed as one of the descendants of Annetje Jans, or Bogardus, formerly wife of Domine Everardus Bogardus, one undivided fifth part of one-sixth of sixty-two acres of land in the city of New York, once known by the name of the Domine's Bowery, confirmed to the children and heirs

of Annetje Jans by Governor Nicholls in 1667. The bill alleged that in 1705 the corporation of Trinity Church went into possession of the said premises, claiming the same under a conveyance called a deed of transport from a part of the children and heirs of Annetje Jans to Colonel Francis Lovelace, executed in March, 1671, which only conveyed to him an undivided portion of the premises, and also under the mesne conveyance of a grant from the Crown of Great Britain, made in 1705, whereby the corporation became a tenant in common with and trustee for one Cornelius Bogardus, who died possessed of an undivided one-sixth of the premises in 1707, and his heirs. The bill prayed for a discovery of the rents and profits of the premises, and of the proceeds of the sale of parts thereof, and for an account and payment of one-fifth of one-sixth of the same. The defendants pleaded in bar that by virtue of the grant from Queen Anne in 1705 they became seized of the premises as sole and exclusive owners thereof in fee simple, and had at all times thereafter asserted and exercised such exclusive ownership. The chancellor held upon the defendants' plea that " at the expiration of sixty years from that time [1705] the right of the complainant's ancestor, if he previously had any, was completely barred." Answering the claim of tenancy in common with the corporation the chancellor said: " If, therefore, Lovelace, or his assigns entered under that deed of transport, claiming title to the whole, although they might in fact be only entitled to an undivided portion, as tenants in common, it would be a good color of title to support an adverse possession. And it would be such an ouster of their co-tenants in common as to bar their right, at the expiration of the period of limitation as settled by the laws in force at the time such adverse possession commenced." On appeal to the Court of Errors, the decree of the chancellor was affirmed in 1835. (15 Wend. 111.)

The complainant having died in 1833, the suit was revived on a bill of revivor on behalf of his heirs, and after the affirmance of the decree the complainants took issue upon the plea by filing a replication. The cause was finally brought to a hearing and was finally submitted to the vice-chancellor in January, 1847. Besides the documentary evidence and

proofs taken in the usual mode before the examiner, many witnesses were examined in open court, the hearing occupying thirteen days. The decision dismissing the bill is reported in 4 Sandford's Chancery, 633. The report contains a detailed statement of the evidence produced at the hearing, and the opinion of Vice-Chancellor SANDFORD, after a painstaking examination of the numerous claims asserted by the complainants, effectually demonstrates their futility and the incontestability of Trinity's title founded upon adverse possession. The vice-chancellor concludes his opinion with the statement: " I feel bound to say, that a plainer case has never been presented to me as a judge. Were it not for the uncommon magnitude of the claim, the apparent sincerity and zeal of the counsel who supported it, and the fact (of which I have been oftentimes admonished, by personal applications on their behalf) that the descendants of Anneke Jans at this day, are hundreds, if not thousands in number, I should not have deemed it necessary to deliver a written judgment on deciding the cause. * * * Indeed, it would be monstrous, if, after a possession such as has been proved in this case, for a period of nearly a century and a half, open, notorious, and within sight of the temple of justice, the successive claimants, save one, being men of full age, and the courts open to them all the time (except for seven years of war and revolution,) the title of lands were to be litigated successfully, upon a claim which has been suspended for five generations. Few titles in this country would be secure under such an administration of the law; and its adoption would lead to scenes of fraud, corruption, foul injustice and legal rapine, far worse in their consequences upon the peace, good order, and happiness of society, than external war or domestic insurrection."

In 1834 a bill in chancery was filed against the corporation by one Humbert and other alleged heirs of Anneke Jans Bogardus to settle the boundary of certain lands owned by the respective parties, and also to take an account between them of certain other lands alleged to be held by them as tenants in common. The defendant's demurrer to the bill was sustained by the vice-chancellor with leave to amend, and on

appeal to the chancellor the decree was affirmed and the bill dismissed. (*Humbert* v. *Rector, etc., Trinity Church,* 7 Paige, 195.) The decree of the chancellor was subsequently affirmed by the Court of Errors in 1840, upon the ground that it appeared on the face of the bill that the Statute of Limitations was a complete bar to the suit. (*Humbert* v. *Trinity Church,* 24 Wend. 587.)

*People* v. *Rector, etc., of Trinity Church* (22 N. Y. 44) was an action in ejectment commenced in the year 1856 to recover a lot of land on Murray street in the city of New York, which the People in their complaint claimed to own in fee. The defendants pleaded (1) a general denial, (2) the Statute of Limitations, and (3) title in fee since the year 1706. A judgment of nonsuit, directed at the close of the plaintiff's case, was affirmed on appeal to the General Term (30 Barb. 537), and on further appeal to the Court of Appeals, in which latter court all of the judges concurred in so much of the opinion of COMSTOCK, Ch. J., as held that the Statute of Limitations was a bar to the action.

In *Kiersted* v. *People of the State of New York* (1 Abb. Pr. 385), in which the corporation was named as a party defendant, the plaintiff sought to compel the State to demand possession of the land of the corporation and an accounting. The defendants' demurrer to the complaint was sustained upon the ground that there was no power in the State courts to entertain a suit brought against the State itself except as authorized by statute.

In *Van Giessen* v. *Bridgford* (83 N. Y. 348) the Court of Appeals affirmed the surrogate's denial of an application for letters of administration with the will annexed of the estate of Anneke Jans Bogardus, holding that after a lapse of two centuries the surrogate was not only justified in deciding, but was bound to decide that there was no estate left unadministered.

We have refrained in the foregoing review of authorities from enumerating the various contentions made on behalf of the heirs in their attempt to overthrow the title of the corporation. The more important contentions, however, which such authorities discuss and find unavailing, may be summarized as follows:

(a) That the church obtained its grant through false representations to the Queen with the fraudulent intent of appropriating other property. (*Humbert* v. *Trinity Church*, 24 Wend. 587.)

(b) That the transport from the children or heirs of Anneke Jans to Governor Lovelace in March, 1670–1671, was not signed by all. (*Bogardus Case*, 4 Sandf. Ch. 633.)

(c) That the letters patent of the grant were not properly signed. (*Bogardus Case, supra.*)

(d) That the proper seal was not on the grant or letters patent from Queen Anne. (*Bogardus Case, supra.*)

(e) That the church could not hold the land because the annual income exceeded £500. (*Bogardus Case, supra.*)

(f) That the church held the property as trustee for the heirs. (*Bogardus Case, supra.*)

(g) That the Queen was not in the sole possession of the Queen's farm at the date of her grant to Trinity Church in 1705. (*Bogardus Case, supra.*)

(h) That insomuch as Trinity Church had at one time admitted its tenancy under the Crown, it could not at any time thereafter claim to be a tenant in fee. (*People* v. *Rector, etc., Trinity Church*, 22 N. Y. 44, 49.)

(i) That the grant was in contravention of the Colonial act of 1699. (Id. 49, 50, 52.)

(j) That the Queen's order in Council of 1708 rejecting the repealing act and approving the original one reinvested the Crown with the title. (Id. 52, 53.)

(k) That the charter of the church contained an assertion of title on the part of the Crown. (Id. 53.)

(l) That the Council of Safety (1779) by their proceedings divested the church corporation of its estate and placed it in nine persons named in their ordinance; that the State in its subsequent act (1784) confirmed these proceedings without revesting the church with the title; that no legal provision having been made on the subject, they were unappropriated lands upon which the Constitution of 1821 took effect devoting their proceeds to the common school fund. (Id. 54, 55.)

Notwithstanding the foregoing adverse adjudications, it appears that attempts continued to be made by lawyers throughout the United States to obtain money from the

Bogardus heirs for the purpose of prosecuting their supposed claims. The evidence likewise permits the inference that there was a concerted movement on the part of certain individuals or groups of individuals to foster among the heirs the conviction that they had been the victims of a great wrong which might, in some way, be righted. There was in the city of New York an association called " Union Association of Heirs of Harlem, Anneke Jans Bogardus, Edwards, and Webber Estates," of which one Fonda was president. In January, 1912, Fonda retained the respondent in connection with the investigation of the claims of the said heirs. Shortly thereafter, Fonda and another of his attorneys, one Good, were indicted in the United States courts for the fraudulent use of the mails, the indictment charging, in substance, that they sent out literature to and solicited and received contributions from various persons upon the representation that as heirs of Anneke Jans Bogardus, they were entitled to and could recover the lands in question from Trinity Church.

Of the circular letters referred to in the petition, fourteen in number purport to emanate from the association and conclude with a request that communications be addressed to John H. Fonda at 255 West Thirteenth street, New York city. " Circular Letter No. 1 " was distributed in April, 1912, while the indictment against Fonda was still pending. This circular contains a letter concededly written to the respondent in the course of his work by the Secretary of State, and sets out copies of certain ancient grants which he is said to have received from that official. These documents are followed by the statement: " It is our purpose to make this investigation most thorough and complete from the foundation grant to the present time, *provided there are those sufficiently interested to support and meet the necessary expenses to justify such investigation.*"

The circular then continues with reference to the task to be accomplished: " This is a herculean task, and cannot be accomplished without the expenditure of a great deal of energy and labor, and a vast amount of money. It is idle to expect such an investigation without substantial and continuous financial support, which the subject matter has never received. ' *He who sows little, reaps little.*' "

With respect to the means of relief available to the heirs the circular states: " It is not becoming at this time to make any promise that any litigation is possible on behalf of any of the descendants of Anneke Jans Bogardus with respect to any part of the properties. It would be foolhardy to dream of such litigation. Such question must be left until the investigation is concluded, the records before us, and the evidence in hand. Think of an attorney advising the commencement of a suit without his proof before him; then, and not until then, will it be fitting for any one to suggest, or conceive the idea of a lawsuit, and with respect to this property it is only fair to say that even then there is grave doubt that there is any legal remedy available, and that if redress is to be had it must come from legislative act or through other channels. At the proper time this question can be considered, but not now. Not until the investigation has been completed from the foundation to the present time, and each link in the chain made secure, and the proof convincing and uncontrovertible, is it fitting to ask any reputable attorney for an opinion."

The circular concludes with the quotation: " Faith is the substance of things hoped for — the evidence of things unseen."

A detailed discussion of the remaining circulars would serve no useful purpose. Each contains an appeal for funds to enable the work to proceed. Circular letter No. 2 begins and ends with such an appeal. Circular letter No. 3 conveys the impression that the indictment of Fonda was occasioned by Trinity's fear of losing its property as a result of his investigations. Circular letter No. 4 is merely a reprint of a letter written by the respondent to the law firm of Jay & Candler, attorneys for the Trinity Corporation, inviting the latter's aid and stating that " The investigation is for the purpose of ascertaining how the title passed out of the name of Anneke Jans Bogardus, or the heirs of Anneke Jans Bogardus; " a letter very obviously written for subsequent publication. Circular letter No. 5 contains a plea for " at least one thousand dollars a month," calling attention to the necessity of examining Colonial grants in London. It refers to the grant to Trinity Corporation in 1705, and states that " apparently the situa-

tion so far presented indicates that Anneke Jans Bogardus had her grants many years prior to the alleged grants to the Trinity Corporation."

Circular letter No. 6 quotes the reply of Jay & Candler to the respondent's letter printed in circular letter No. 4, and states with reference to the cases cited therein as establishing Trinity's title: " They cite various cases decided years ago but which offer no conclusive evidence and establish nothing so far as this investigation is concerned; for we know not whether this litigation was conducted after a thorough investigation or whether, as many lawsuits are brought, before the proof was collected. Our plan is to collect the proof before considering any litigation possible. The citing of cases is one thing. These cases will be fully reported. We must have the full record of all the evidence offered or rejected or thrown out upon the trial of these cases, as soon as funds are available, to fully determine what bearing these cases may have upon the present investigation. Any comment upon these cases, for reasons indicated, must be postponed until the records are secured. The fact that a party fails in a lawsuit does not necessarily mean that his claim was not good — much depends upon the way in which the case is prepared and presented — many circumstances enter into the whys and wherefores of the end of any litigation."

Circular letter No. 14 begins: " The Association, etc." and after suggesting voluntary contributions of funds states " The Association." This circular is of especial interest in the false impression it conveys with respect to the basis of the dismissal of the criminal prosecution against Fonda, stating: " Those of our friends who * * * were informed of the indictment of our President * * * can now judge for themselves whether Trinity or the truth was the strongest in that instance." The indictment was, in fact, dismissed upon the ground that Fonda lacked guilty intent to defraud because he was possessed of an obsession or illusion as to the validity of the claims against Trinity. While the defendant Good was acquitted by the jury, the trial court in his charge stated: " I think we must assume that he [Good] was an extremely incapable lawyer, or that he was engaged in a very deliberate fraud."

While denying any responsibility for the circular letters published under Fonda's name, the respondent was Fonda's attorney at the time of their distribution and admitted that the latter from time to time gave him copies thereof. The letters are not those of an illiterate man, as Fonda was characterized by the trial judge in dismissing the indictment against him. While we are deprived of Fonda's testimony by reason of his death, in February, 1915, there can be little doubt but that the respondent was a participant in the circularization done by him, or in his behalf.

In any event, the practices employed by Fonda were continued by the respondent after his break with Fonda, which he placed at some months prior to November, 1914. It appears that a Mrs. Wright, a Mrs. Buys and one Brower co-operated in sending out circular letters generally. Mrs. Wright was confidential secretary to the respondent, who lived at her house as a boarder. Mrs. Buys was a close friend of Mrs. Wright and at times lived with her. Brower was a member of the association and one of the respondent's clients. Mrs. Wright had Fonda's list of names of the Bogardus heirs, to which Mrs. Buys added some 500 names. The circulars thereafter sent to the heirs were printed copies of letters originally written by the respondent " to some client," and sent out by one of the parties named. Mrs. Buys was accustomed to inclose a printed form of retainer of which some 5,000 to 10,000 had been printed. The respondent denied that he had anything to do with sending out either the retainers or circulars.

The respondent objected to Mrs. Wright's testifying concerning the information which she embodied in her circular letters, claiming that she was a confidential employee and hence not permitted to testify. Although the objection was overruled and she was directed to testify, the witness placed her refusal to answer on the ground that her livelihood was at stake. She admitted, however, that the letters contained material in connection with the work from the respondent's files. With respect to one of these letters she testified: " Now you must understand *that in some cases when Mr. Gridley is sending out letters*, I used my own judgment. He writes the letter and into that letter to his client I put the carbon

First Department, October, 1917.        [Vol. 179.

copies of other letters. That Mr. Gridley has nothing to do with it. I used my own judgment in regard to it entirely. He writes the letter. Now Mr. Brower returned me, or Mrs. Buys, I will not say which I got it from, the Curtis letter and I had it printed at their direction."

As to the moneys obtained as a result of these activities, the witness testified: " I could not say that. There has been no money received on this matter except from clients, and they had to be first clients."

When the appropriate interest had been aroused, the printed retainer form was sent to the prospective clients. A copy of this form is in evidence. It is addressed to the respondent and states, by way of introduction, that the prospective client understands that respondent is collecting data, records, proofs, etc., incident to the questions relating to the alleged passing out of the title to the lands granted Anneke Jans Bogardus. The relationship of the prospective client to the original owners is set forth by an appropriate statement, and the client then states that being interested in the completion of respondent's investigation, he voluntarily, without solicitation and " without promise or reward or return, desire to retain your services in conjunction with any others who may desire to do likewise, solely for the purpose of having you complete such investigation and for your services in that connection I pay you now a retainer of $———— and agree to pay you monthly from date the further sum of $———— for the period of six months, at the expiration of which time all further payments shall cease." At the bottom of the form is printed: " I wish you would write to the following parties for me," with spaces for the names and addresses of other prospective clients.

At this point we may well consider a number of exhibits in evidence as having been distributed by way of circulars or as " reports to clients." One of these is a typewritten letter, addressed in blank, under date of October 15, 1914, and signed with respondent's name. It contained a plea for money and was sent to one Marshall at Auburn in the State of Washington. Mrs. Wright would only say that the letter belonged to the respondent's file, and respondent himself that it was a communication to a certain client. He failed

to produce the original of the letter, which he claims to have addressed to a client other than Marshall.

Another letter, indorsed at the top as was the one last mentioned, " Copy for your Information," and dated October 21, 1914, is a plea to respondent's clients to back him up, financially and otherwise. It contains a request that the recipients refuse to show his correspondence to government officials, and that all envelopes which the clients received from him be opened with a knife and returned to him.

There is also a printed circular which sets out a copy of a letter admitted to have been written by the respondent to Mrs. Buys, dated January 26, 1914. This letter does not neglect the subject of funds, and with respect to the prospect of litigation, states that while Trinity has thus far successfully defended her right to the property, no case had been brought in the United States courts " involving the question of the right to this property, or the application of the provision of the first Constitution of the State of New York, Article 36 (quoting that article)." After a discussion of one or two of the New York decisions, the letter concludes: " In conclusion, Mrs. Buys, you must decide, shall the questions and issues involved in this matter be presented to the United States Courts for review or decision? Shall relief be sought through legislation? And, finally, if necessary, shall appeal be made to that all powerful and final Court — public opinion — which wieldeth an arm than which what is more potent and decisive? "

A typewritten letter under respondent's name, dated December 26, 1914, and also indorsed " Copy For Your Information," states: " After two hundred years the proof, the certified proof, has been brought forward, which, in my opinion, establishes uncontrovertably [sic], and for all time, that the Lovelace deed is invalid, if not a spurious record, thus establishing forever that Queen Anne did not own the Bogardus lands, and therefore could not cover those lands by grant to Trinity. * * * Have we not to-day, Trinity, with its back up against the wall, and forced to stand and stand alone on its claim of adverse possession. Which can be likened to the man who built his house on the shifting sands, and the winds and waves came and washed it away. These

shifting sands of adverse possession are always subject to legislative repeal or modification."

Still another letter dated November 7, 1914, written by the respondent to one Eckman after his break with Fonda, contains a long recital of his relations with Fonda and a severe criticism of the latter's methods. Eckman was apparently engaged in the same sort of enterprise as the respondent, and with respect to his assertion that the rights of the Bogardus heirs were to be obtained by a partition of the lands by cotenants in common, respondent wrote: " This theory was tried 150 years ago in the case reported in 4 Sandford Rep. This is not the one and only way — but I am not telling you the other; but I will say that if you are going to gull $25 out of each heir on this statement, you had better go a little slow. This theory having been tried and decision in the annals against it, don't you think that perhaps if you try to collect money on it through the mails the Government might try to take a hand in it? * * * · It is not right for you to collect money on a theory which has been tried in our courts and failed, and any ' eminent counsel ' who reads the law can advise you of that fact. Has your eminent counsel advised you that should you get into trouble for collecting money under color of bringing such a suit, that twelve jurymen might question your good faith? "

There can be no real question as to the respondent's participation in the work of circularization. The retainer agreement clearly formed a part of an entire scheme, and assumes the recipient's familiarity with the work in which the respondent was engaged. The circulars are stamped with a stamp, a duplicate of which respondent admitted that he had and used. His letter to Mrs. Buys is a sufficient answer to his claim that he never contemplated any litigation, or in any event until his investigation had been completed. In addition to the campaign for funds thus conducted, it appears from the testimony of Washburn, a lawyer practicing in Chicago, Ill., that after consulting with respondent in behalf of a western client, respondent showed him a deed, implying that it was given at the instance of Trinity Church and was a method used by the church for secretly settling claims; that the respondent asked Washburn to obtain a substantial

fee from his client, Andrews, which he declined to consider, reporting to his client that the claim of the so-called Edwards estate against the church was without merit.

Generally speaking, it appears to have been quite impossible to get from the respondent any intelligent statement as to the scope and character of the work he had done, or of the grounds of his belief that a successful result might be achieved. He was unable to state the discovery of a single fact or document other than those already passed upon in the reported cases. He intimated that British citizens were entitled to claim under the treaty of 1794 between the United States and England, and asserted that the utility to his clients of article II of this treaty depended on other facts. At first declining to explain this assertion, or what the other facts were, upon the claim of privilege, upon being advised by the learned official referee that the claim was untenable, he stated: " I don't recall any other facts just now, Judge, except those that came from clients." While we are unable to understand how the title, held to be good against the world, could thus be abrogated, in a ruling in 1885, Thomas F. Bayard, former Secretary of State, said of this treaty: " The treaty of 1794 is held by the highest authorities to have actually lapsed by reason of the subsequent state of war in 1812–1815, and neither the treaty of Ghent nor any treaty between the two countries since then re-enacted its provisions in whole or in part."

When questioned in respect to the statement in his letter of December 26, 1914, that " after two hundred years the certified proof had been brought forward, establishing that the Lovelace deed was an invalid, if not a spurious record," the respondent explained that this certified proof was the fact that the deceased daughter of Anneke Jans Bogardus was supposed to be represented by an attorney, and that the acknowledgment to the Lovelace transport was not according to the laws in force at that time. This so-called proof presented nothing that had not already been urged upon the court in the cases heretofore discussed.

The respondent's suggestion that relief might be obtained by legislative action is clearly without merit, and the respondent, indeed, admitted that he abandoned the idea of procuring legislation as simply fruitless. With respect to his claim

that a final conclusion of the validity or invalidity of Trinity's title could not be reached without an examination of the Colonial records in London, it appears that such an examination had already been made and was found futile.

The learned official referee, upon this branch of the proceeding, concludes: " I feel therefore bound to find that the request made by Mrs. Gridley that Mr. Washburn should obtain for him a substantial fee from Mr. Andrews, Mr. Washburn's client, and the part which Mr. Gridley took in soliciting contribution indiscriminately all over the country towards defraying his expenses of alleged investigations made and to be made by him, although he knew they would lead to no result, were a part of a cunningly devised scheme to get money from as many of the so-called heirs as he could beguile into trusting him. This scheme was fraudulent and Mr. Gridley's acts done in pursuance thereof were not only against the ethics of the profession, but also constituted gross professional misconduct under section 88 of the Judiciary Law as amended."*

After a careful consideration of the evidence, we reach the same conclusion. We deem it, therefore, unnecessary to consider in this opinion the evidence with respect to respondent's alleged misconduct in his negotiations with Calligari. Upon his own admissions he drew and was prepared to execute an improper agreement of retainer. The learned official referee has found this charge also sustained and we fully concur in his finding.

The respondent urges that he has committed no professional impropriety, that he had the right to solicit funds to conduct an investigation, no matter how many cases had been decided adversely to the claims of the Anneke Jans heirs. We are satisfied that he was endeavoring to obtain money from credulous and uninformed people knowing that there was no chance of success, knowing that he had no new information and unable to advance any theory upon which probable success could be based, which had not already been advanced to and been disposed of by the courts.

* See Consol. Laws, chap. 30 (Laws of 1909, chap. 35), § 88, subd. 2, as amd. by Laws of 1912, chap. 253, and Laws of 1913, chap. 720.— [Rep.

In our opinion he should no longer be permitted to prosecute such an enterprise under the guise of an attorney at law. The respondent is, therefore, disbarred.

LAUGHLIN, SCOTT, SMITH and SHEARN, JJ., concurred.

Respondent disbarred.   Order to be settled on notice.