# FAY *v.* NEW YORK.

NO. 377.

Argued April 3, 1947.—Decided June 23, 1947.

262

*Harold R. Medina* argued the cause for petitioner in No. 377. With him on the brief were *Robert J. Fitzsimmons* and *Richard T. Davis*.

*Moses Polakoff* and *Samuel Mezansky* submitted on brief for petitioner in No. 452.

*Whitman Knapp* argued the cause for respondent. With him on the brief were *Frank S. Hogan, Joseph A. Sarafite* and *Eugene A. Leiman*.

MR. JUSTICE JACKSON delivered the opinion of the Court.

These cases present the same issue, a challenge to the constitutionality of the special or so-called "blue ribbon" jury as used by state courts in the State and County of New York.

Such a jury found Fay and Bove guilty of conspiracy to extort and of extortion. Bove was Vice-President of the International Hod Carriers, Building and Common Laborers' Union of America. Fay was Vice-President of the International Union of Operating Engineers. The City of New York awarded contracts for construction of an extensive project known as the Delaware Water Supply system to several large construction concerns. It was not denied that Fay and Bove collected

from these contractors upwards of $300,000. But it was denied that payment was induced by threats to do unlawful injury to person or property. The defense claimed that the payments were voluntary—bribes, perhaps, but not extortion—that these men were paid merely for undertaking to assist the contractors to avoid labor trouble, to prevent jurisdictional or unauthorized strikes, and to "handle the labor situation," and that Fay and Bove rendered service as agreed.

The indictment charged the crimes in seven counts. One was dismissed by the court; the remaining six were submitted to the jury. The jury acquitted the defendants on three of the counts, disagreed on another, and convicted on two counts. The convictions were affirmed on appeal by the Appellate Division of the Supreme Court,[1] which reviews both law and fact,[2] and by the Court of Appeals.[3] No federal question is raised as to the merits of the finding of guilt and we are to assume that the convictions were warranted by the evidence and, except for questions as to the special jury, were regular. While there was challenge to the panel from which this jury was drawn, on ground of denial of federal due process and equal protection, each individual juror was accepted by the defendants without challenge for cause. The challenge to the special jury panel was not discussed by either of the appellate courts of the State but the federal questions were sufficiently and timely raised throughout and were overruled by all state courts. A dual system of juries presents easy possibilities of violation of the Fourteenth Amendment and we took these cases by certiorari to examine the charges of unconstitutionality. 329 U. S. 697.

---

[1] 270 App. Div. 261, 59 N. Y. S. 2d 127.

[2] Code of Criminal Procedure, §§ 520, 543-a, 66 McKinney's Consolidated Laws of New York, part 2, pp. 328-29, 429.

[3] 296 N. Y. 510, 68 N. E. 2d 453.

266

The question is whether a warranted conviction by a jury individually accepted as fair and unbiased should be set aside on the ground that the make-up of the panel from which they were drawn unfairly narrows the choice of jurors and denies defendants due process of law or equal protection of the laws in violation of the Fourteenth Amendment to the Federal Constitution. If answered in the affirmative, it means that no conviction by these special juries is constitutionally valid, and all would be set aside if the question had been properly raised at or before trial.

The defendants raise no question as to the constitutionality of the general statutes of New York which prescribe the qualifications, disqualifications and exemptions for ordinary jury service. Neither is any question raised as to the administration of these general statutes by which the population of New York County, numbering some 1,800,000, is sifted to produce a general jury panel of about 60,000, unless it be that there is discrimination against women.[4] It is from this panel that defendants insist, apart from any objection they may have as to improper exclusion of women even from the general panel, they had a constitutional right to have their trial jury drawn. The statutes advanced as a standard may be roughly summarized:

To qualify as a juror, a person must be an American citizen and a resident of the county; not less than 21 nor more than 70 years old; the owner or spouse of an owner of property of the value of $250; in possession of his or her natural faculties and not infirm or decrepit; not convicted of a felony or a misdemeanor involving moral turpitude; intelligent; of sound mind and good character;

---

[4] But 7,000 of the 60,000 on the general jury panel, or 11%, are women. It is almost frivolous to assert that there is a bias against their inclusion on juries. *Cf. Akins* v. *Texas*, 325 U. S. 398, 403.

well-informed; able to read and write the English language understandingly.[5]   From those qualified the following classes are exempt from service: clergymen, physicians, dentists, pharmacists, embalmers, optometrists, attorneys, members of the Army, Navy or Marine Corps, or of the National Guard or Naval Militia, firemen, policemen, ship's officers, pilots, editors, editorial writers, subeditors, reporters and copy readers.[6]

Women are equally qualified with men,[7] but as they also are granted exemption,[8] a woman drawn may serve or not, as she chooses.

The attack is focused upon the statutes and sifting procedures which shrink the general panel to the special or "blue ribbon" panel of about 3,000.

Special jurors are selected from those accepted for the general panel by the county clerk, but only after each has been subpoenaed for personal appearance and has testified under oath as to his qualification and fitness.[9]   The statute prescribes standards for their selection by declaring ineligible and directing elimination of these classes: (1) All who have been disqualified or who claim and are allowed exemption from general service. (2) All who have been convicted of a criminal offense, or found guilty of fraud or misconduct by judgment of any civil court.   (3) All who possess such conscientious opinions with regard to the death penalty as would preclude their finding a defendant guilty if the crime charged be

[5] Judiciary Law, § 596, 29 McKinney's Consolidated Laws of New York (pocket part, 1946), pp. 131–32.

[6] Judiciary Law, § 599, 29 McKinney's Consolidated Laws of New York (pocket part, 1946), pp. 133–34.

[7] Judiciary Law, § 596, *supra.*

[8] Judiciary Law, § 599, *supra.*

[9] Judiciary Law, § 749–aa3, 29 McKinney's Consolidated Laws of New York, pp. 512–13.

punishable with death. (4) All who doubt their ability to lay aside an opinion or impression formed from newspaper reading or otherwise, or to render an impartial verdict upon the evidence uninfluenced by any such opinion or impression, or whose opinion of circumstantial evidence is such as would prevent their finding a verdict of guilty upon such evidence, or who avow such a prejudice against any law of the State as would preclude finding a defendant guilty of a violation of such law, or who avow such a prejudice against any particular defense to a criminal charge as would prevent giving a fair and impartial trial upon the merits of such defense, or who avow that they cannot in all cases give to a defendant who fails to testify as a witness in his own behalf the full benefit of the statutory provision that such defendant's neglect or refusal to testify as a witness in his own behalf shall not create any presumption against him.[10]

The special jury panel is not one brought into existence for this particular case nor for any special class of offenses or type of accused. It is part of the regular machinery of trial in counties of one million or more inhabitants. In its sound discretion the court may order trial by special jury on application of either party in a civil action and by either the prosecution or defense in criminal cases. The motion may be granted only on a showing that "by reason of the importance or intricacy of the case, a special jury is required" or "the issue to be tried has been so widely commented upon . . . that an ordinary jury cannot without delay and difficulty be obtained" or that for any other reason "the due, efficient and impartial administration of justice in the particular case would be

---

[10] Judiciary Law, § 749–aa2, 29 McKinney's Consolidated Laws of New York, p. 512.

advanced by the trial of such an issue by a special jury . . . ."[11]

This special jury statute is not recent nor is the practice under it novel. The progenitor of this statute, like it in all pertinent respects, was enacted in 1896 but was repealed and simultaneously reenacted in substantially its present form in 1901.[12] It was soon attacked as on its face violating the State Constitution. The claim of one convicted by a special jury that it was an unconstitutional body because its restrictive composition denied due process of law, was rejected by the Court of Appeals in a well-considered opinion. *People* v. *Dunn,* 157 N. Y. 528, 52 N. E. 572 (1899). The attack then was made from the opposite direction. One convicted by an ordinary jury claimed that it was an unconstitutional body. This claim that the special panel had withdrawn twenty-five hundred "men of presumably superior intelligence," 162 N. Y. at 362, 56 N. E. at 759, too, was rejected by the Court of Appeals. *People* v. *Meyer,* 162 N. Y. 357, 56 N. E. 758 (1900).

Then, in 1901, an attack on the constitutionality of the statute was rejected by this Court. One Hall had been convicted of murder by a special jury and sentenced to death. He sued out a writ of *habeas corpus* which was denied below. He challenged the special panel and claimed that his conviction by its verdict was a denial of due process of law and of equal protection of the laws in violation of the Fourteenth Amendment because the jury was "taken from a particular body of citizens and not from the general body of the county as was provided in all cases wherein such special jury was not drawn." . This Court affirmed, *Hall* v. *Johnson,* 186 U. S. 480, citing

---

[11] Judiciary Law, § 749–aa4, 29 McKinney's Consolidated Laws of New York, pp. 513–14.

[12] N. Y. Laws 1896, c. 378; N. Y. Laws 1901, c. 602.

among other authorities *Brown* v. *New Jersey,* 175 U. S. 172, which upheld a state statute for a "struck jury." [13]

Since these decisions, the special jury has been in continuous use in New York County in important cases. The District Attorney cites over one hundred murder convictions, on verdict of the special jury, considered by the Court of Appeals which affirmed judgments of death. We are asked, however, to reconsider the question and, in the light of more recent trends of decision and of particular facts about the present operation of the jury system not advanced in support of the argument in the earlier case, to disapprove the special jury system.

We fail to perceive on its face any constitutional offense in the statutory standards prescribed for the special panel. The Act does not exclude, or authorize the clerk to exclude, any person or class because of race, creed, color or occupation. It imposes no qualification of an economic nature beyond that imposed by the concededly valid general panel statute. Each of the grounds of elimination is reasonably and closely related to the juror's suitability for the kind of service the special panel requires or to his fitness to judge the kind of cases for which it is most frequently utilized. Not all of the grounds of elimination would appear relevant to the issues of the present case. But we know of no right of defendants to have a specially constituted panel which would include all persons who might

---

[13] The other cases cited in the *per curiam* affirmance were *Storti* v. *Massachusetts,* 183 U. S. 138, 141, and *Andrews* v. *Swartz,* 156 U. S. 272, both of which disapprove the use of *habeas corpus* as a substitute for writ of error. It is not clear, therefore, how much the affirmance of the *Hall* case depended on that procedural ground rather than on a disposition of the merits. Moreover, the grounds urged against the special jury in that case related to its selection from a panel which was only a segment of the general panel and did not assert the exclusion of particular groups.

be fitted to hear their particular and unique case. This panel is for service in a wide variety of cases and its eliminations must be judged in that light. We cannot overlook that one of the features which has tended to discredit jury trials is interminable examination and rejection of prospective jurors. In a metropolis with notoriously congested court calendars we cannot find it constitutionally forbidden to set up administrative procedures in advance of trial to eliminate from the panel those who, in a large proportion of cases, would be rejected by the court after its time had been taken in examination to ascertain the disqualifications. Many of the standards of elimination which the clerk is directed to apply in choice of the panel are those the court would have to apply to excuse a juror on challenge for cause.

These are matters with which local authority must and does have considerable latitude to cope, for they affect the administration of justice which is a local responsibility. For example, in this case the time of the trial court and its entire retinue of attendants was taken while eighty-nine prospective jurors were examined. How many more would have been examined if the clerk had not already eliminated those who admit that they would not give defendants benefit of the rule that their neglect or refusal to testify in their own behalf would not create a presumption against them? Neither of these defendants saw fit to take the witness stand. The defendants themselves have complained of the exceptional publicity given to the charges in this case. How many more jurors would have been examined if the clerk had not already eliminated those who felt themselves subject to influence by publicity? These are practical matters in administering justice in which we will take care not to hamstring local authority by artificial or doctrinaire requirements.

It has consistently been held that a jury is not rendered constitutionally invalid by failure of the statute to set forth any standards for selection. *Murray* v. *Louisiana,* 163 U. S. 101, 108; *Franklin* v. *South Carolina,* 218 U. S. 161, 167–68; *Akins* v. *Texas,* 325 U. S. 398, 403; see also *Ex parte Virginia,* 100 U. S. 339, 348. We find nothing in the standards New York has prescribed which, on its face, is prohibited by the Constitution. There remain, however, more serious questions as to whether the special jury Act has been so administered as to deny due process to the defendants and whether the dual system of jury panels as administered denied equal protection of the laws.

As to the actual results of application of the statute, the litigants are in controversy. The New York courts, doubtless influenced by the fact that long ago they had upheld similar statutes, made no findings of fact and wrote no opinion on the subject. It is to be regretted that we must deal with questions of fact without aid of findings by the courts whose experience with the system and proximity to the local conditions with which the special jury customs are so interwoven would entitle their findings to very great weight. We would, in any case, be obliged on a constitutional question to reach our own conclusions, after full allowance of weight to findings of the state courts, and in this case must examine the evidence. *Norris* v. *Alabama,* 294 U. S. 587, 590; *Lisenba* v. *California,* 314 U. S. 219, 237–38; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 148.

The allegations of fact upon which defendants ask us to hold these special panels unconstitutional come to three: (1) That laborers, operatives, craftsmen, foremen and service employees were systematically, intentionally and deliberately excluded from the panel. (2) That

women were in the same way excluded. (3) That the special panel is so composed as to be more prone to convict than the general panel.

(1) The proof that laborers and such were excluded consists of a tabulation of occupations as listed in the questionnaires filed with the clerk. The table received in evidence is set out in the margin.[14] It is said in criticism of this list that it shows the industry in which these

[14] The table was prepared at the request of petitioners' counsel by an attorney who testified that he "found various occupations listed" and "tried to classify them to groups, making them not too numerous."

| | |
|---|---:|
| Total number of special jurors on file in New York County Clerk's Office | 2,911 |
| Total number with classifiable occupations | 2,743 |
| Auditors and accountants | 166 |
| Bankers | 170 |
| Manufacturers | 106 |
| Real Estate Brokers | 117 |
| Retired | 62 |
| Architects and engineers | 229 |
| Educators, teachers, librarians | 27 |
| Executives, managers of industrial enterprises | 470 |
| Stock brokers | 185 |
| Salesmen, promoters of business enterprises and advertising men | 438 |
| Newspaper men, editorial writers and others engaged in the dissemination of information | 148 |
| Mechanics | 5 |
| Insurance men | 166 |
| Travel agency men | 10 |
| Civil service employees | 21 |
| Office clerks | 94 |
| Retail merchants | 144 |
| Entertainers | 26 |
| Building and construction superintendents | 70 |
| Chemists and physicists | 66 |
| Attorneys | 5 |
| Laborers | None |

persons work rather than whether they are laborers or craftsmen; that is, "mechanics" may be and probably are also laborers; "bankers" may be clerks. Certainly the tabulation does not show the relation of these jurors to the industry in which they were classified, as, for example, whether they were owners or financially interested, or merely employees. It does not show absence or exclusion of wage earners or of union members, although none listed themselves as "laborers," for several of these classes are obviously of the employee rather than the entrepreneur character. One of petitioners' tables showed that 38% of the special panel were "clerical, sales, and kindred workers." Three of those examined as jurors in this case were members of labor unions. Two were peremptorily challenged by the People and the one accepted by the prosecution was challenged by the defense.

It is sought to give significance to this exhibit showing the breakdown into occupations of some 2,700 special jurors, however, by reference to a tabulation of occupations of some 920,000 employees and persons seeking employment in Manhattan. The comparison is said to show a great disparity between the percentage of jurors of each occupation represented on the jury list of 1945 and the occupational distribution of the number of employed persons or experienced persons seeking employment in

Labor union representatives........................... 1
Housewives......................................... 20
—There are only about 30 women on the entire special jury list—
Petitioners' attorneys requested the Bureau of Labor Statistics of the United States Department of Labor to conform the classifications of the above table to the Census classifications. In the table thus prepared, twenty-one persons are classed as civil service employees and a note cautions that "Some members of this group undoubtedly belong elsewhere, as under service trades, or laborers." One hundred and sixty-five persons are listed as unclassifiable in the Bureau's table.

Manhattan in 1940.   This table was not put in evidence but is reproduced in the margin.[15]   Apart from the discrepancy of five years in the dates of the data and the

15

OCCUPATIONS OF EMPLOYED PERSONS (EXCEPT ON PUBLIC EMERGENCY WORK) AND OF EXPERIENCED WORKERS SEEKING WORK, RESIDING IN MANHATTAN IN THE WEEK OF MARCH 24 TO 30, 1940, COMPARED WITH OCCUPATIONS OF SPECIAL JURORS ON FILE IN NEW YORK COUNTY CLERK'S OFFICE, JANUARY 31, 1945.

| Occupation | Experienced Labor Force [a] | | | | | | Special Jurors |
| | Total | | | Males | | | |
| | Total | Employed [c] | Seeking work, experienced | Total | Employed [c] | Seeking work, experienced | |
| | A | B | C | D | E | F | G |
| Total [b] | 921,183 | 778,202 | 142,981 | 589,431 | 489,618 | 99,813 | 2,664 |
| Professional and semiprofessional | 111,600 | 98,343 | 13,257 | 61,191 | 53,416 | 7,775 | 501 |
| Proprietors, managers and officials | 85,969 | 81,234 | 4,735 | 73,732 | 69,509 | 4,223 | 1,146 |
| Clerical, sales and kindred workers | 196,037 | 169,066 | 26,971 | 112,316 | 95,853 | 16,463 | 1,012 |
| Craftsmen, foremen and kindred workers | 70,497 | 54,217 | 16,280 | 67,504 | 51,618 | 15,886 | 5 |
| Operatives and kindred workers | 156,581 | 128,253 | 28,328 | 98,493 | 79,562 | 18,931 | -------- |
| Service workers | 254,595 | 216,992 | 37,603 | 131,112 | 110,157 | 20,955 | -------- |
| Laborers, except farm | 45,375 | 29,869 | 15,506 | 44,578 | 29,293 | 15,285 | -------- |
| Farmers, farm managers, farm laborers | 529 | 228 | 301 | 505 | 210 | 295 | -------- |
| | Percent | | | Percent | | | |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Professional and semiprofessional | 12.1 | 12.6 | 9.3 | 10.4 | 10.9 | 7.8 | 18.8 |
| Proprietors, managers and officials | 9.3 | 10.4 | 3.3 | 12.5 | 14.2 | 4.2 | 43.0 |
| Clerical, sales and kindred workers | 21.3 | 21.7 | 18.9 | 19.1 | 19.6 | 16.5 | 38.0 |
| Craftsmen, foremen and kindred workers | 7.7 | 7.0 | 11.4 | 11.4 | 10.5 | 15.9 | 0.2 |
| Operatives and kindred workers | 17.0 | 16.5 | 19.8 | 16.7 | 16.2 | 19.0 | -------- |
| Service workers | 27.6 | 27.9 | 26.3 | 22.2 | 22.5 | 21.0 | -------- |
| Laborers, except farm | 4.9 | 3.8 | 10.8 | 7.6 | 6.0 | 15.3 | -------- |
| Farmers, farm managers, farm laborers | 0.1 | [d] | 0.2 | 0.1 | [d] | 0.3 | -------- |

[a] Includes the employed (except those on public emergency work) and experienced workers seeking work.  Source: U. S. Bureau of the Census.  Sixteenth Census of the United States, 1940, Population, v. III, part 4, New York State Table 10a, pp. 363–365.
[b] Omitting the unclassified, as well as housewives, retired persons, and others not in the labor force.
[c] Except on public emergency work.
[d] Less than one-tenth of one percent.

differences in classification of occupations, the two tables do not afford statistical proof that the jury percentages are the result of discrimination. Such a conclusion would be justified only if we knew whether the application of the proper jury standards would affect all occupations alike, of which there is no evidence and which we regard as improbable. The percentage of persons employed or seeking employment in each occupation does not establish even an approximate ratio for those of each occupation that should appear in a fairly selected jury panel. The former is not limited, as the latter must be, to those over 21 or under 70 years of age. It is common knowledge that many employed and seekers of employment in New York are not, as jurors must be, citizens of the United States. How many could not meet the property qualifications? How many could not read and write the English language understandingly? It is only after effect is given to these admittedly constitutional requirements that we would have any figures which determined or even suggested the effect of the additional disqualifications imposed on special jurors.

An occupational comparison of the special panel with the general panel might afford some ground for an opinion on the effect of the particular practices complained of in the composition of the special panel. But no such comparison is offered. Petitioners' only statement as to the comparative make-up of the general and special panels is as follows: "While the defect of discrimination against women, particularly those who are not members of so-called 'civic conscious' organizations, permeates both the general and special juries, there is no evidence whatever that laborers, operatives, service employees, craftsmen, and foremen, are excluded from the general jury panel." What is more to the point is that petitioners adduced no

evidence whatever that the occupational composition of the general panel is substantially different from that of the special. If they are the same, then petitioners' assertion that Question 23, referred to below, somehow separates the rich from the poor is obviously without merit. It is not unlikely that the requirements of citizenship, property and literacy disqualify a greater proportion of laborers, craftsmen and service employees than of some other classes. Those who are illiterate or, if literate in their own, are unable to speak or write the English language, naturally find employment chiefly in manual work. It is impossible from the defendants' evidence in this case to find that the distribution of the jury panel among occupations is not the result of the application of legitimate standards of disqualification.

On the other hand, the evidence that there has been no discrimination as to occupation in selection of the panel, while from interested witnesses, whose duty it was to administer the law, is clear and positive and is neither contradicted nor improbable. The testimony of those in charge of the selection, offered by the defendants themselves, is that without occupational discrimination they applied the standards of the statute to all whom they examined. We are unable to find that this evidence is untrue.

(2) As to the exclusion of women, it will be remembered that the law of New York gives to women the privilege to serve but does not impose service as a duty. It is said to have been found impractical to compel large numbers of women, who have an absolute exemption, to come to the clerk's office for examination since they so generally assert their exemption. Hence, only those who volunteer or are suggested as willing to serve by other women or by organizations, including the League of Women Voters, are

subpoenaed for examination. Some effort is made by the officials also to induce women to volunteer. But the evidence does not show that women are excluded from the special jury. In this case three women talesmen were examined. One was pronounced "satisfactory" by both sides and served on the jury.

As to both women and men, it is complained that eliminations resulted unfairly from use of a questionnaire, which asked, "What months of the year between October 1 and June 30 would you prefer to serve (Name two or more months)." Those who stated a preference, and they were many, were excluded from the special panel although they continued eligible for the general panel. The reason given for this is that service on the general panel can be adjusted to such preferences while the special panel, because of the nature of the cases tried before it, may require service at any time and for long periods. We think the phrasing of this question is less than candid in view of this purpose. But we find no evidence that it operates more misleadingly on women than on men, or on one occupation or class than on others. While it does not commend itself, it appears to be an administrative ineptitude of no constitutional significance and of no prejudice to these defendants.

(3) A more serious allegation against the special jury panel is that it is more inclined than the general panel to convict. Extensive studies have been made by the New York State Judicial Council which is under the duty of continuous study of the procedures of the courts and of making recommendations for improvement to the Legislature.[16] It is on studies and criticisms by this official body that petitioners base their charge here that the special jury is a convicting jury in an unconstitutional sense.

[16] Judiciary Law, §§ 40–48, 29 McKinney's Consolidated Laws of New York, pp. 58–62, (pocket part, 1946), p. 17.

In 1937 the Council recommended abolition of struck juries,[17] foreign juries [18] and special juries.[19]   It said that, "A well-administered ordinary jury system should produce jurors of as high calibre for every action as the special jury system attempts to provide in exceptional cases." [20]   The recommendation was followed by the Legislature except as to special juries.   In 1938 the Judicial Council renewed its recommendation as to these.   It summarized that its data "indicate that special juries are prone to convict." [21]   In a study of certain types of homicide cases, it found that, in 1933 and 1934, special juries convicted in eighty-three percent and eighty-two percent of the cases while ordinary juries those years convicted in forty-three percent and thirty-seven percent respectively.   It reported that, "The Judicial Council believes that every petit jury should be of uniformly high calibre and capable of giving a fair trial in all cases.   To attain this goal, the ordinary jury, as now provided, may be in need of improvement.   It is, however, unjust and should be unnecessary to select sup-

---

[17] To obtain a struck jury, the commissioner of jurors or the county clerk, in the presence of the parties, selected from the general jury list the names of forty-eight persons whom he deemed most indifferent between the parties and best qualified to try the case.   The parties then alternately would each strike off twelve names from the list. The jury was chosen from the remaining twenty-four names.

[18] The foreign jury was chosen from a county adjoining that where the trial was to be held, in cases in which it was thought a more impartial jury would thus be had.   It lost its usefulness because of the ease with which a change of venue might be obtained.   Code of Criminal Procedure, § 344.2, 66 McKinney's Consolidated Laws of New York, part 1, p. 622.

[19] Third Annual Report of the Judicial Council of the State of New York (1937) 123–28.

[20] *Id.* at 127.

[21] Fourth Annual Report of the Judicial Council of the State of New York (1938) 46.

posedly special juries in specific cases."[22]  The Council
next year reported that the general panel had not been
considered adequate, largely because in its selection the
standards of the statute had not been followed, and that a
complete reexamination of the general panel was under-
taken.[23]  From time to time the Council renewed its
recommendation.  In 1945 it proposed that the special
jury "be abolished as unnecessary and undesirable."  It
said, "It is undisputed that the revised jury system for
New York City recommended by the Judicial Council
and in operation since 1940 has succeeded in improving
the quality of jurors generally by applying to all jurors
the high standards which formerly were required only of
special jurors.  Thus, the necessity for special jurors no
longer exists."[24]

While the Judicial Council has pointed out and in-
vestigated the different conviction ratios, it has at no
time suggested that the special jury has been inclined
to convict except where conviction was warranted.  New
York extends an appeal on law and fact as matter of
right.[25]  If there were a tendency to convict improperly,
the Judicial Council, which includes the Chief Judge of
the Court of Appeals and the Presiding Justice of the
Appellate Division, which courts review these cases, would
know it.  Despite the Council's desire to abolish this jury,
no such reasons were ever assigned.  No statistics are pro-
duced to show that special juries have been more often
reversed on the facts than ordinary ones.  Of course, it
would be impossible for us to say, even were we to examine
the cases in detail, whether the difference in percentage of

---

[22] *Id.* at 47.

[23] Fifth Annual Report of the Judicial Council of the State of New
York (1939) 42–43.

[24] Eleventh Annual Report of the Judicial Council of the State of
New York (1945) 49–50.

[25] See note 2, *supra.*

convictions indicated a too great readiness to convict on the part of special juries or a too great readiness to acquit on the part of ordinary juries, or whether the disparity reflected a difference between the ordinary case and those selected for special jury trial, rather than a reflection of an attitude on the part of either panel. It may result from the greater attention and better counsel which the prosecution gives to these important cases.

These defendants were convicted March 15, 1945, when the statistics offered here as to relative propensity of the two juries to convict were more than ten years old, and when the conditions which may have produced the discrepancy in ratio of convictions had long since been corrected.

The evidence in support of these objections may well, as the Judicial Council thought, warrant a political or social judgment that this special panel in 1945 was "unnecessary and undesirable" and that the Legislature should abolish it. But it is quite another matter to say that this Federal Court has a mandate from the Constitution to disable the special jury by setting aside its convictions. The great disparity between a legislative policy or a political judgment on the one hand and a constitutional or legal judgment on the other, finds striking illustration in the position taken by the highest judicial personages in New York State who joined in the recommendation to abolish the special jury.

Two members [26] of the Council who joined in proposing legislation to abolish the dual system sat in this case and abstained from putting their legislative recommendation into a court decision—they sustained as constitutional the system they would abolish as matter of policy. Our function concerns only constitutionality and we turn to

---

[26] Loughran, Ch. J., New York Court of Appeals, and Martin, P. J., App. Div. (1st Dept.).

the bearing of federal constitutional provisions on the legal issues.

It is not easy, and it should not be easy, for defendants to have proceedings set aside and held for naught on constitutional grounds when they have accepted as satisfactory all of the individual jurors who sat in their case, the jury exercised such discriminating and dispassionate judgment as to acquit them on three of the five counts submitted, and their conviction on a full judicial review of the facts and law has been found justified. This Court has long dealt and must continue to deal with these controversies from state courts with self-imposed restraints intended to protect itself and the state against irresponsible exercise of its unappealable power.

While this case does not involve any question as to exclusion of Negroes or any other race, the defendants rely largely upon a series of decisions in which this Court has set aside state court convictions of Negroes because Negroes were purposefully and completely excluded from the jury. However, because of the long history of unhappy relations between the two races, Congress has put these cases in a class by themselves. The Fourteenth Amendment, in addition to due process and equal protection clauses, declares that "The Congress shall have power to enforce, by appropriate legislation, the provisions of this Article." So empowered, the Congress on March 1, 1875, enacted that "no citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude;" and made it a crime for any officer to exclude any citizen on those grounds. 18 Stat. 336–37, 8 U. S. C. § 44. For us the majestic generalities of the Fourteenth Amendment are thus reduced to a concrete statutory command when cases involve race or color which is

wanting in every other case of alleged discrimination. This statute was a factor so decisive in establishing the Negro case precedents that the Court even hinted that there might be no judicial power to intervene except in matters authorized by Acts of Congress. Referring to the provision empowering Congress to enforce the Fourteenth Amendment, it said that "All of the amendments derive much of their force from this latter provision. It is not said the *judicial power* of the general government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed. It is not said that branch of the government shall be authorized to declare void any action of a State in violation of the prohibitions. It is the power of Congress which has been enlarged. Congress is authorized to *enforce* the prohibitions by appropriate legislation." (Italics in original.) *Ex parte Virginia,* 100 U. S. 339, 345.

It is significant that this Court never has interfered with the composition of state court juries except in cases where this guidance of Congress was applicable. In an opinion by Mr. Justice Holmes it unanimously made short work of rejecting a claim that the Fourteenth Amendment prohibits the state from excluding from the jury certain occupational groups such as lawyers, preachers, ministers, doctors, dentists, and engineers and firemen of railroad trains. *Rawlins* v. *Georgia,* 201 U. S. 638. *Cf. Brown* v. *New Jersey,* 175 U. S. 172.

We do not mean that no case of discrimination in jury drawing except those involving race or color can carry such unjust consequences as to amount to a denial of equal protection or due process of law. But we do say that since Congress has considered the specific application of this Amendment to the state jury systems and has found only these discriminations to deserve general legislative condemnation, one who would have the judiciary intervene on grounds not covered by statute must comply

with the exacting requirements of proving clearly that in his own case the procedure has gone so far afield that its results are a denial of equal protection or due process.[27]

These rules to confine our use of power to responsible limits have been formulated and applied even in cases where the federal race and color statute applied. Certainly they should apply with equal, if not greater, rigor in cases that are outside the statute.

It is fundamental in questioning the composition of a jury that a mere showing that a class was not represented in a particular jury is not enough; there must be a clear showing that its absence was caused by discrimination, and in nearly all cases it has been shown to have persisted over many years.[28] *Virginia* v. *Rives,* 100 U. S. 313, 322–23; *Martin* v. *Texas,* 200 U. S. 316, 320–21; *Thomas* v. *Texas,* 212 U. S. 278, 282; *Smith* v. *Texas,* 311

---

[27] It is unnecessary to decide whether the equal protection clause of the Fourteenth Amendment might of its own force prohibit discrimination on account of race in the selection of jurors, so that such discrimination would violate the due process clause of the same Amendment. Nor need we decide whether the due process clause alone outlaws such discrimination. *Cf. Hill* v. *Texas,* 316 U. S. 400, 406: "But no State is at liberty to impose upon one charged with crime a discrimination in its trial procedure which the Constitution, and an Act of Congress passed pursuant to the Constitution, alike forbid. . . . it is our duty as well as the State's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees. Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained. Equal protection of the laws is something more than an abstract right. It is a command which the State must respect, the benefits of which every person may demand."

[28] Official records of the New York county clerk show that in the five-year period, 1940–44, 2,407 new jurors were put on the special panel which is maintained at about 3,000, and 2,692 persons were removed from the list.

U. S. 128; *Hill* v. *Texas,* 316 U. S. 400; *Akins* v. *Texas, supra.* Also, when discrimination of an unconstitutional kind is alleged, the burden of proving it purposeful and intentional is on the defendant. *Tarrance* v. *Florida,* 188 U. S. 519; *Martin* v. *Texas,* 200 U. S. 316; *Norris* v. *Alabama,* 294 U. S. 587; *Snowden* v. *Hughes,* 321 U. S. 1, 8–9; *Akins* v. *Texas,* 325 U. S. 398, 400.

Our only source of power or guidance for interfering in this case with the state court jury system is found in the cryptic words of the Fourteenth Amendment, unaided by any word from Congress or any governing precedent in this Court. We consider first the clause which forbids a state to "deny to any person within its jurisdiction the equal protection of the laws." This prohibits prejudicial disparities before the law. Under it a system which might be constitutionally unobjectionable, if applied to all, may be brought within the prohibition if some have more favorable treatment. The inquiry under this clause involves defendants' standing before the law relative to that of others accused.

If it were proved that in 1945 an inequality between the special jury's record of convictions and that of the ordinary jury continued as it was found by the Judicial Council to have prevailed in 1933–34, some foundation would be laid for a claim of unequal treatment. No defendant has a right to escape an existing mechanism of trial merely on the ground that some other could be devised which would give him a better chance of acquittal. But in this case an alternative system actually was provided by the state to other defendants. A state is not required to try all classes of offenses in the same forum. But a discretion, even if vested in the court, to shunt a defendant before a jury so chosen as greatly to lessen his chances while others accused of a like offense are tried by a jury so drawn as to be more favorable to them, would hardly be "equal protection of the laws." Perhaps

it could be shown that the difference in percentages of convictions was not due to a difference in attitude of the jurors but to a difference in the cases that were selected for special jury trial, or to a more intensive preparation and effort by the prosecution in cases singled out for such trial. But a ratio of conviction so disparate, if it continued until 1945, might, in absence of explanation, be taken to indicate that the special jury was, in contrast to its alternate, organized to convict. A defendant could complain of this inequality even if it were shown that a special jury court never had convicted any defendant who did not deserve conviction.

But the defendants have failed to show by any evidence whatever that this disparity in ratio of conviction existed in 1945 when they were tried. They show that it ever existed only by the studies and conclusions of the Judicial Council. The same source shows that it was corrected before these defendants were tried. As we have pointed out, this official body challenged the fairness of this dual system as formerly constituted and as early as 1937 declared that "A well-considered jury system will insure an impartial cross-section of the community on every petit jury," [29] and set out means to achieve it. We know of no reason why we should ignore or discredit their assurance that by administrative improvements in the selection of the ordinary juries they became the substantial equivalent of the special jury before these trials took place.

We hold, therefore, that defendants have not carried the burden of showing that the method of their trial denied them equal protection of the law.

The defendants' other objection is grounded on that clause of the Fourteenth Amendment which provides, "nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." It com-

---

[29] Third Annual Report of the Judicial Council of the State of New York (1937) 123.

prises objections which might be urged against any jury made up as the special jury was, even if it were the only jury in use in the state. It does not depend upon comparison with the jury facilities afforded other defendants.

This Court, however, has never entertained a defendant's objections to exclusions from the jury except when he was a member of the excluded class. *Rawlins* v. *Georgia,* 201 U. S. 638, 640. *Cf. Strauder* v. *West Virginia,* 100 U. S. 303. Relief has been held unavailable to a negro who objected that all white persons were purposely excluded from the grand jury that indicted him. *Haraway* v. *State,* 203 Ark. 912, 159 S. W. 2d 733. Nevertheless, we need not here decide whether lack of identity with an excluded group would alone defeat an otherwise well-established case under the Amendment.

These defendants rely heavily on arguments drawn from our decisions in *Glasser* v. *United States,* 315 U. S. 60; *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217; and *Ballard* v. *United States,* 329 U. S. 187. The facts in the present case are distinguishable in vital and obvious particulars from those in any of these cases. But those decisions were not constrained by any duty of deference to the authority of the State over local administration of justice. They dealt only with juries in federal courts. Over federal proceedings we may exert a supervisory power with greater freedom to reflect our notions of good policy than we may constitutionally exert over proceedings in state courts, and these expressions of policy are not necessarily embodied in the concept of due process.

The due process clause is one of comprehensive generality, and in reducing it to apply in concrete cases there are different schools of thought. One is that its content on any subject is to be determined by the content of certain relevant other Amendments in the Bill of Rights which originally imposed restraints on only the Federal

288

Government but which the Fourteenth Amendment deflected against the states. The other theory is that the clause has an independent content apart from, and in addition to, any and all other Amendments. This meaning is derived from the history, evolution and present nature of our institutions and is to be spelled out from time to time in specific cases by the judiciary.

To treat first of the former doctrine, it steadily has been ruled that the commandments of the Sixth and Seventh Amendments, which require jury trial in criminal and certain civil cases, are not picked up by the due process clause of the Fourteenth so as to become limitations on the states. "This court has ruled that consistently with those amendments trial by jury may be modified by a state or abolished altogether." *Palko* v. *Connecticut,* 302 U. S. 319, 324, and cases there cited. Unless we are now so to change our interpretation as to withdraw from the states the power so lately conceded to be theirs, this would end the matter under the view that the force of the due process clause is exhausted when it has applied the principles of other relevant Amendments.

But this Court has construed it to be inherent in the independent concept of due process that condemnation shall be rendered only after a trial, in which the hearing is a real one, not a sham or pretense. *Palko* v. *Connecticut,* 302 U. S. 319, 327; *Mooney* v. *Holohan,* 294 U. S. 103; *Moore* v. *Dempsey,* 261 U. S. 86. Trial must be held before a tribunal not biased by interest in the event. *Tumey* v. *Ohio,* 273 U. S. 510. Undoubtedly a system of exclusions could be so manipulated as to call a jury before which defendants would have so little chance of a decision on the evidence that it would constitute a denial of due process. A verdict on the evidence, however, is all an accused can claim; he is not entitled to a set-up that will give a chance of escape after he is properly proven guilty. Society also has a right to a fair trial. The defendant's

right is a neutral jury. He has no constitutional right to friends on the jury.

To establish the unfairness of this tribunal and the lack of due process afforded to one who is being tried before it, the defendants assert two defects in its composition: first, that it unconstitutionally excluded women, and, second, that it unconstitutionally excluded laborers, craftsmen, service employees, and others of like occupation, amounting in sum to the exclusion of an economic class.

Assuming that defendants, not being women, have standing to complain of exclusion of women from the general and special jury panels, we are unable to sustain their objection. Approximately 7,000 women were on the general panel of 60,000 and 30 were on the special panel. One served on the jury which convicted the petitioners. The proportion of women on the jury panels did not equal their proportion of the population. There may be no logical reason for this, but there is an historical one. Until recently, and for nearly a half-century after the Fourteenth Amendment was adopted, it was universal practice in the United States to allow only men to sit on juries. The first state to permit women jurors was Washington, and it did not do so until 1911.[30] In 1942 only 28 states permitted women to serve on juries and they were still disqualified in the other 20. Moreover, in 15 of the 28 states which permitted women to serve, they might claim exemption because of their sex.[31] It would, in the light of this history,

---

[30] 1911 Laws of Washington, c. 57. See Carson, Women Jurors (1928).

[31] Report to the Judicial Conference of the Committee on Selection of Jurors (1942) 23. A later bulletin of the Women's Bureau of the United States Department of Labor showed that in 1945, 31 States permitted jury service by women, exemption being allowed in 15 of them. But 17 States still withheld their approval of women on juries. A pamphlet of the Women's Bureau, as yet unpublished, shows that at this time four more states find women acceptable as jurors.

take something more than a judicial interpretation to spell out of the Constitution a command to set aside verdicts rendered by juries unleavened by feminine influence. The contention that women should be on the jury is not based on the Constitution, it is based on a changing view of the rights and responsibilities of women in our public life, which has progressed in all phases of life, including jury duty, but has achieved constitutional compulsion on the states only in the grant of the franchise by the Nineteenth Amendment. We may insist on their inclusion on federal juries where by state law they are eligible [32] but woman jury service has not so become a part of the textual or customary law of the land that one convicted of crime must be set free by this Court if his state has lagged behind what we personally may regard as the most desirable practice in recognizing the rights and obligations of womanhood.

The other objection which petitioners urge under the due process clause is that the special jury panel was invalidated by exclusion of an economic group comprising such specified classifications as laborers, craftsmen and service employees. They argue that the jury panel was chosen "with a purpose to obtain persons of conservative views, persons of the upper economic and social stratum in New York County, persons having a tendency to convict defendants accused of crime, and to exclude those who might understand the point of view of the laboring man." As we have pointed out, there is no proof of exclusion of these.[33]

---

[32] See Judicial Code, §§ 275, 276, 28 U. S. C. §§ 411, 412; *Ballard* v. *United States,* 329 U. S. 187.

[33] It is worth comment that the annual reports of the Judicial Council, on which petitioners heavily rely, although they urge strongly and persistently that the special jury be abolished, do not give as one of the reasons the social make-up of the panel. This is odd, if that

At most, the proof shows lack of proportional representation and there is an utter deficiency of proof that this was the result of a purpose to discriminate against this group as such. The uncontradicted evidence is that no person was excluded because of his occupation or economic status. All were subjected to the same tests of intelligence, citizenship and understanding of English. The state's right to apply these tests is not open to doubt even though they disqualify, especially in the conditions that prevail in New York, a disproportionate number of manual workers. A fair application of literacy, intelligence and other tests would hardly act with proportional equality on all levels of life. The most that the evidence does is to raise, rather than answer, the question whether there was an unlawful disproportionate representation of lower income groups on the special jury.

Even in the Negro cases, this Court has never undertaken to say that a want of proportionate representation of groups, which is not proved to be deliberate and intentional, is sufficient to violate the Constitution. *Akins* v. *Texas,* 325 U. S. 398. If the Court has hesitated to require proportional representation where but two groups need be considered and identification of each group is fairly clear, how much more imprudent would it be to require proportional representation of economic classes. The occupations which are said to comprise the economic class allegedly excluded from the special panel are separated by such uncertain lines that the defendants' two exhibits are based on different classifications which are numerous and overlapping.

No significant difference in viewpoint between those allegedly excluded and those permitted to serve has been

reason were valid, since the Council obviously was interested in urging all good reasons which would support its strong disapproval and its reiterated recommendation.

proved and nothing in our experience permits us to assume it.[34]   It would require large assumptions to say that one's present economic status, in a society as fluid as ours, determines his outlook in the trial of cases in general or of this one in particular.   There is of course legitimate conflict of interest among economic groups, but they are so many and so overlie each other that not all can be significant. There is entrepreneur and wage-earner, consumer and producer, taxpayer and civil servant, foreman and laborer, white-collar worker and manual laborer.   But we are not ready to assume that these differences of function degenerate into a hostility such that one cannot expect justice at the hands of occupations and groups other than his own. Were this true, an extremely rich man could rarely have a fair trial, for his class is not often found sitting on juries.[35]

Nor is there any such persuasive reason for dealing with purposeful occupational or economic discriminations if they do exist as presumptive constitutional violations, as would be the case with regard to purposeful discriminations because of race or color.   We do not need to find

[34] *Cf. Rawlins* v. *Georgia,* 201 U. S. 638, 640: "The nature of the classes excluded was not such as was likely to affect the conduct of the members as jurymen, or to make them act otherwise than those who were drawn would act."

[35] We are unable to say that mere exclusion of jurors of one's occupation renders a jury unconstitutional, even though the occupation tends to give those who practice it a particular and distinctive viewpoint. New York has some 20,000 policemen presumably otherwise qualified for jury service.   It is not unknown that a defendant is a policeman. Can he not be constitutionally tried if policemen are exempt from service or even excluded from the panel?   There is some discretion left in the states to say that persons in some occupations are more needed at their work than on jury duty and, perhaps, that some have occupational attitudes that make it appropriate to leave them off the list so long as an unexceptionable list remains on call.   *Cf. Rawlins* v. *Georgia,* 201 U. S. 638.   See Knox, *Selection of Federal Jurors,* 31 Journal of the American Judicature Society 9, 11.

prejudice in these latter exclusions, but *cf. Strauder* v. *West Virginia,* 100 U. S. 303, 306–309, for Congress has forbidden them, and a tribunal set up in defiance of its command is an unlawful one whether we think it unfair or not. But as to other exclusions, we must find them such as to deny a fair trial before they can be labeled as unconstitutional.

There may be special cases where exclusion of laborers would indicate that those sitting were prejudiced against labor defendants, as where a labor leader is on trial on charges growing out of a labor dispute. The situation would be similar to that of a Negro who confronts a jury on which no Negro is allowed to sit. He might very well say that a community which purposely discriminates against all Negroes discriminates against him. But it is quite different if we assume that "persons of conservative views" do predominate on the special jury. Does it follow that "liberals" would be more favorably disposed toward a defense that nominal labor leaders were hiring out to employers to "handle" their labor problems? Does it follow that a jury from the "upper economic and social stratum" would be more disposed to convict those who so undertake to serve two masters than "those who might understand the point of view of the laboring man"? We should think it might be the other way about and defendants offer nothing but assertion to convince us. Our attention, moreover, is called to federal court records which show that Fay reported a net taxable income of over $65,000 for the years 1940 to 1942, while Bove reported over $39,000 for a similar period, both of them exclusive of the sums received from the contractors and involved in these charges. These earnings do not identify them very closely with the viewpoint of the depressed classes. The group with which they might be most closely identified is organized labor. But it cannot be claimed that union members were excluded from this special panel since three

union members were called for examination on this particular jury, two being rejected by the People and one by the defendants themselves. The defendants have shown no intentional and purposeful exclusion of any class, and they have shown none that was prejudicial to them. They have had a fair trial, and no reason appears why they should escape its results.

The function of this federal Court under the Fourteenth Amendment in reference to state juries is not to prescribe procedures but is essentially to protect the integrity of the trial process by whatever method the state sees fit to employ. No device, whether conventional or newly devised, can be set up by which the judicial process is reduced to a sham and courts are organized to convict. They must be organized to hear, try and determine on the evidence and the law. But beyond requiring conformity to standards of fundamental fairness that have won legal recognition, this Court always has been careful not so to interpret this Amendment as to impose uniform procedures upon the several states whose legal systems stem from diverse sources of law and reflect different historical influences.[36]

---

[36] While English common law is the source from which it often is assumed a uniform system was derived by the States of the United States, it must not be overlooked that many of them have been deeply influenced by Roman and civil law to which their history exposed them. None of the territory west of the Alleghenies was more than briefly or casually subject to common law before the Revolution. French civil law prevailed in most of the Ohio and Mississippi Valleys from their settlement until Wolfe's decisive victory before Quebec in 1763. Its ascendancy in the north then was broken, and in 1803 the Louisiana Purchase ended French sovereignty in the rest of the Mississippi area. Louisiana continues, however, a system of law based on the Code Napoleon. The Southwest and Florida once were Spanish. See Colvin, *Participation of the United States of America with the Republics of Latin America in the Common Heritage of Roman*

We adhere to this policy of self-restraint and will not use this great centralizing Amendment to standardize administration of justice and stagnate local variations in practice. The jury system is one which has undergone great modifications in its long history, see *People* v. *Dunn,* 157 N. Y. 528, 52 N. E. 572, and it is still undergoing revision and adaptation to adjust it to the tensions of time and locality. In no place are American institutions put to greater strain than in the City of New York with its some seven and a half million inhabitants gathered from the four corners of the earth and a daily transient flow of two million, with all that this implies of difficulty in law enforcement. The citizen there, as in other jurisdictions, has been called for jury service to perform a variety of functions—the grand jury, the petit jury, the sheriff's jury, the coroner's jury, the foreign jury, the struck jury,

*and Civil Law,* 10 Proceedings of the Eighth American Scientific Congress 467.

Even among the early seaboard States, the English common law had rivals. The Swedes on the banks of the Delaware held one of the earliest jury trials on this continent. The Governor followed Swedish law and custom in calling to his aid in judging "assistants" who were selected from among "the principal and wisest inhabitants" and were both judges and jurors and sometimes witnesses. See 1 Johnson, The Swedish Settlements on the Delaware (1911) 450 *et seq.* In New York, there was a deep and persistent influence from Roman Dutch law. Upon capitulation of New Amsterdam, it was stipulated that certain Dutch law, and judgments and customs should be respected. But even beyond this, in the organization of the courts the Dutch rule persisted although contrary to the "Duke's Laws" enacted by the conqueror. The history of the early Dutch influence in New York court procedure was preserved by the diligence and foresight of Judge Daly. 1 E. D. Smith's Reports (New York Common Pleas) xvii, xxxiv, xxxvii. The Roman-Dutch element in New York law is recognized by its courts, *e. g., Dunham* v. *Williams,* 37 N. Y. 251, 253; *Van Giessen* v. *Bridgford,* 83 N. Y. 348, 356; *Smith* v. *Rentz,* 131 N. Y. 169, 175, 30 N. E. 54, 56.

and the special jury.   The states have had different and constantly changing tests of eligibility for service.   Evolution of the jury continues even now, and many experiments are under way that were strange to the common law.   Some states have taken measures to restrict its use; others, where jury service is a hardship, diminish the required number of jurors.   Some states no longer require the unanimous verdict; others add alternate or substitute jurors to avoid mistrial in case of sickness or death. Some states have abolished the general verdict and require answers to specific questions.[37]   Well has it been said of our power to limit state action that "To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation.   It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."   Mr. Justice Brandeis, dissenting in *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311.

As there is no violation of a federal statute alleged, the challenge to this judgment under the due process clause must stand or fall on a showing that these defendants have had a trial so unfair as to amount to a taking of their liberty without due process of law.   On this record we think that showing has not been made.

*Affirmed.*

Mr. Justice Murphy, dissenting.

The equal protection clause of the Fourteenth Amendment prohibits a state from convicting any person by use of a jury which is not impartially drawn from a cross-section of the community.   That means that juries must

---

[37] See 8 Encyclopedia of the Social Sciences 492.

be chosen without systematic and intentional exclusion of any otherwise qualified group of individuals. *Smith* v. *Texas,* 311 U. S. 128. Only in that way can the democratic traditions of the jury system be preserved. *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 220; *Glasser* v. *United States,* 315 U. S. 60, 85. It is because I believe that this constitutional standard of jury selection has been ignored in the creation of the so-called "blue ribbon" jury panel in this case that I am forced to dissent.

Preliminarily, it should be noted that legislation by Congress prohibiting the particular kind of inequality here involved is unnecessary to enable us to strike it down under the Constitution. While Congress has the power to enforce by appropriate legislation the provisions of the Fourteenth Amendment, and has done so relative to discrimination in jury selection on the basis of race or color, its failure to legislate as to economic or other discrimination in jury selection does not permit us to stand idly by. We have consistently interfered with state procedure and state legislation when we felt that they were inconsistent with the Fourteenth Amendment or with the federal commerce power despite Congressional silence on the matter involved. See, *e. g., West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624; *Nippert* v. *Richmond,* 327 U. S. 416; *Morgan* v. *Virginia,* 328 U. S. 373. And so in this case we are entitled to judge the action of New York by constitutional standards without regard to the absence of relevant federal legislation.

The constitutional vice inherent in the type of "blue ribbon" jury panel here involved is that it rests upon intentional and systematic exclusion of certain classes of people who are admittedly qualified to serve on the general jury panel. Whatever may be the standards erected by jury officials for distinguishing between those eligible

for such a "blue ribbon" panel and those who are not, the distinction itself is an invalid one.   It denies the defendant his constitutional right to be tried by a jury fairly drawn from a cross-section of the community.   It forces upon him a jury drawn from a panel chosen in a manner which tends to obliterate the representative basis of the jury.

The selection of the "blue ribbon" panel in this case rests upon the "degree of intelligence as revealed by the questionnaire" sent to prospective jurors, augmented by personal interviews.   The questionnaire, however, does not purport to be a test of native intelligence, nor does it appear to offer any sound basis for distinguishing the intelligence of one person from another.   The undeniable result has been to permit the jury officials to formulate whatever standards they desire, whether in terms of "intelligence" or some other factor, to eliminate persons from the "blue ribbon" panel, even though they admittedly are qualified for general jury service.   That fact is strikingly borne out by the statistics compiled in this case as to the personnel of the "blue ribbon" panel.   Certain classes of individuals are totally unrepresented on the panel despite their general qualifications and despite the fact that high intelligence is to be found in such classes.

| | Percentage of total experienced labor forces in Manhattan. | Percentage of representation on "blue ribbon" panel. |
|---|---|---|
| Professional and semi-professional.. | 12. 1 | 18. 8 |
| Proprietors, managers and officials.. | 9. 3 | 43 |
| Clerical, sales and kindred workers.. | 21. 3 | 38 |
| Craftsmen, foremen and kindred workers...................... | 7. 7 | 0. 2 |
| Operatives and kindred workers.... | 17 | 0 |
| Service workers.................. | 27. 6 | 0 |
| Laborers ....................... | 4. 9 | 0 |
| Farmers ....................... | 0. 1 | 0 |

Such statistics can only mean that the jury officials have evolved some standard other than that of "intelligence" to exclude certain persons from the "blue ribbon" panel. And that standard is apparently of an economic or social nature, unjustified by the democratic principles of the jury system.

The Court points out some of the difficulties involved in comparing the personnel of the panel with 1940 census figures. But we are dealing here with a very subtle and sophisticated form of discrimination which does not lend itself to easy or precise proof. The proof here is adequate enough to demonstrate that this panel, like every discriminatorily selected "blue ribbon" panel, suffers from a constitutional infirmity. That infirmity is the denial of equal protection to those who are tried by a jury drawn from a "blue ribbon" panel. Such a panel is narrower and different from that used in forming juries to try the vast majority of other accused persons. To the extent of that difference, therefore, the persons tried by "blue ribbon" juries receive unequal protection.

In addition, as illustrated in this case, the distinction that is drawn in fact between "blue ribbon" jurors and general jurors is often of such a character as to destroy the representative nature of the "blue ribbon" panel. There is no constitutional right to a jury drawn from a group of uneducated and unintelligent persons. Nor is there any right to a jury chosen solely from those at the lower end of the economic and social scale. But there is a constitutional right to a jury drawn from a group which represents a cross-section of the community. And a cross-section of the community includes persons with varying degrees of training and intelligence and with varying economic and social positions. Under our Constitution, the jury is not to be made the representative of the most intelligent, the most wealthy or the most successful, nor

of the least intelligent, the least wealthy or the least successful. It is a democratic institution, representative of all qualified classes of people. *Smith* v. *Texas, supra.* To the extent that a "blue ribbon" panel fails to reflect this democratic principle, it is constitutionally defective.

The Court demonstrates rather convincingly that it is difficult to prove that the particular petitioners were prejudiced by the discrimination practiced in this case. Yet that should not excuse the failure to comply with the constitutional standard of jury selection. We can never measure accurately the prejudice that results from the exclusion of certain types of qualified people from a jury panel. Such prejudice is so subtle, so intangible, that it escapes the ordinary methods of proof. It may be absent in one case and present in another; it may gradually and silently erode the jury system before it becomes evident. But it is no less real or meaningful for our purposes. If the constitutional right to a jury impartially drawn from a cross-section of the community has been violated, we should vindicate that right even though the effect of the violation has not yet put in a tangible appearance. Otherwise that right may be irretrievably lost in a welter of evidentiary rules.

Since this "blue ribbon" panel falls short of the constitutional standard of jury selection, the judgments below should be reversed.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE join in this dissent.