**UNITED STATES of America ex rel. Clifton Alton PORET and Edgar Labat, Petitioners,**

**v.**

**Maurice SIGLER, Warden, Louisiana State Penitentiary, Respondent.**

**Misc. No. 550.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Oct. 8, 1964.

---

G. Wray Gill, Gerard H. Schreiber, New Orleans, La., for relator Clifton Alton Poret.

Benjamin E. Smith, Smith, Waltzer, Jones & Peebles, New Orleans, La., for relator Edgar Labat. Edward Bennett Williams, Williams, Wadden & Stein, Washington, D. C., of counsel.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, John E. Jackson, Jr., Michael E. Culligan, Asst. Attys. Gen. of Louisiana, Baton Rouge, La., for respondent.

WEST, District Judge.

This matter is once more before the Court on the application of petitioners, Clifton Alton Poret and Edgar Labat, for the issuance of a writ of habeas corpus. Closely rivaling the now famous Chessman case for duration, this case seems to have no ending. The apparent inability of the State to completely administer its criminal laws, from arrest to punishment, is caused by the almost limitless post-conviction remedies made available to defendants by Federal law in its zeal to protect persons charged with crime from being denied their constitutional rights during the pre-trial and trial proceedings. While no one would seriously question the necessity and wisdom of taking all reasonable precautions to assure an accused defendant the protection of his constitutional rights, nevertheless, it makes a travesty of justice when the tail is allowed to wag the dog in the process. Even capital cases, involving charges and convictions for rape and murder, should, within a reasonable time, be concluded. This case has been allowed to linger in the courts for fourteen long years while piecemeal hearings have been held with various courts hearing and re-hearing petitioners' claims, over and over again. These petitioners have not only had their day in court; they have had years in court. Every aspect of this case has been litigated and

re-litigated and the claims and contentions of petitioners have consistently been rejected by both State and Federal Courts of competent jurisdiction.

Petitioners were charged with having committed rape on a woman in New Orleans, Louisiana, on November 12, 1950. In the early hours of the morning of November 12, 1950, while the prosecuting witness and her escort were walking along a New Orleans street, they were assaulted by the two defendants. Mr. Penedo, the lady's escort, was robbed at gun point, and his lady companion, the prosecuting witness, was raped by the defendants after having her clothes completely torn from her body. Defendant, Labat, was arrested shortly afterwards, but Poret, who fled, and thus became a fugitive from justice, was not found until almost two years later when he was located in a Tennessee penitentiary, serving time under a Tennessee conviction for another crime. After all pre-trial motions and other proceedings were exhausted, the defendants were tried by a jury, convicted, and on May 23, 1953, the death sentence was imposed pursuant to Louisiana law. During the trial, a total of thirty-four bills of exception were reserved on behalf of the defendants, and appeals were subsequently perfected based upon these exceptions. One bill of exception was directed at an allegation that members of defendants' race (Negro) had been systematically excluded from the grand jury which had indicted these defendants. The Supreme Court of Louisiana heard the appeals, and on July 2, 1954, after a thorough and exhaustive review of and inquiry into all thirty-four alleged errors, affirmed the convictions and sentences. State of Louisiana v. Labat and Poret, 226 La. 201, 75 So.2d 333. Rehearing was denied by the Louisiana Supreme Court on October 5, 1954. Applications for writs of certiorari were applied for and the United States Supreme Court granted the writs, 348 U.S. 950, 75 S.Ct. 444, 99 L.Ed. 742 (1955), and after hearing the case, affirmed the convictions and sentences. Michel v. State of Louisiana (Poret and Labat v. State of Louisiana), 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83 (1955), rehearing denied, 350 U.S. 955, 76 S.Ct. 340, 100 L.Ed. 831 (1956). Of the many alleged errors presented, the only question then considered by the United States Supreme Court to be serious was the question raised concerning the composition of the *grand* jury which had indicted petitioners. The United States Supreme Court finally rejected petitioners' plea on the ground that they, petitioners, had failed to timely object to the composition of the jury as required by State law even though they had ample opportunity to have done so.

Thereafter, on September 18, 1957, petitioners filed an application for the issuance of a writ of habeas corpus in this Court, the United States District Court for the Eastern District of Louisiana, based upon an allegation that they had been convicted on coerced and fraudulently obtained evidence. This application was rejected on September 19, 1957, for the reason that petitioners had not exhausted available State remedies in that this contention had never been presented to any Court of the State of Louisiana, and that thus, this Court was without jurisdiction. A further stay of execution was then granted by the United States Fifth Circuit Court of Appeals to allow petitioners time to exhaust available State remedies. Application for habeas corpus was then made by petitioners to the State Court, and on September 25, 1957, the Louisiana Supreme Court denied the writ of habeas corpus, and on the same day, denied a writ of error Coram Nobis. Despite the fact that petitioners claim that they had been convicted on coerced testimony had been thoroughly reviewed and rejected by the highest court of the State of Louisiana, and despite the fact that the United States Supreme Court refused to review that decision, it, the United States Supreme Court, did, on November 18, 1957, remand the case to this Court for consideration of petitioners' previously filed application for habeas corpus, which application was based upon the very same contention that had been rejected by the Louisiana Supreme Court, and whose

decision the United States Supreme Court had refused to review. Pursuant to this remand, this Court, Honorable J. Skelley Wright presiding, brought this matter on for hearing on February 6, 1958. Not only were petitioners heard on the question of coerced testimony, but they were, for all practical purposes, completely tried anew. Some twenty-five witnesses were heard and after a thorough analysis of the testimony, Judge Wright denied petitioners' application for habeas corpus. Labat v. Sigler, D.C., 162 F.Supp. 574. Motions for a new trial and for rehearing were denied, and an appeal lodged with the United States Court of Appeals, Fifth Circuit, which Court, in Labat v. Sigler, 267 F.2d 307 (CA5 1959), affirmed the holding of this Court. Petitioners then applied to the United States Supreme Court for writs of certiorari, United States ex rel. Poret v. Sigler, 361 U.S. 375, 80 S.Ct. 404, 4 L.Ed.2d 380, which writs were granted, and the case again remanded to this Court "for disposition of the question whether members of petitioners' race were deliberately and intentionally limited, and excluded in selection of *petit* jury panels, in violation of the Federal Constitution." Following the order of remand, several pre-trial conferences were held and various new motions filed, heard, and disposed of, and finally on March 31, 1964, this matter came on for another full evidentiary hearing on the question presented to this Court by the United States Supreme Court, i. e., whether or not petitioners' constitutional rights have been violated by a systematic exclusion or a systematic token inclusion of members of the Negro race from the petit jury which tried these petitioners. Following this latest hearing before this Court, during which six witnesses were heard, and several depositions and exhibits received in evidence, all counsel were granted additional time to file further documentary evidence and briefs. Now, after a thorough review of this evidence, it is the opinion of this Court that petitioners' application for the issuance of a writ of habeas corpus must once again be denied.

First of all, when the United States Supreme Court in 1955 refused to set aside the convictions and sentences based upon petitioners' contentions that the grand jury which had indicted them was improperly constituted, it based its judgment on the fact that under Louisiana law, LSA–R.S. 15:202, all objections to the manner of selecting or drawing any juror or jury, or to any defect or irregularity that could be pleaded against any array or venire must be filed, pleaded, heard, or urged before the expiration of the third judicial day of the term for which said jury shall have been drawn, or before entering upon the trial of the case if it be begun sooner and that if such objections are not made, all such objections shall be considered as waived. No such objection was made by petitioners to either the composition of the grand jury or the petit jury within the time allowed by Louisiana law. In the course of its opinion, the United States Supreme Court said:

"It is beyond question that under the Due Process Clause of the Fourteenth Amendment Louisiana may attach reasonable time limitations to the assertion of federal constitutional rights. * * * 'No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right.' * * * Poret's case affords a perfect illustration of the necessity for prompt determination of claims such as he raises here. Five years have now elapsed since the crime was committed, and the delay has been largely caused by Poret's own actions. Even if available, and memory permitted, the victim and chief witness would be reluctant to retell the sordid story of her unfortunate experience. Poret's conviction by a petit jury whose composition he did not attack has been affirmed by Louisiana's highest court and no constitutional challenge is made here to the

fairness of that trial." Michel v. State of Louisiana, supra.

We are now faced with a claim by petitioners fourteen years after the commission of the crime that the petit jury was improperly constituted. Surely the reasoning of the Supreme Court in this case in 1955 is equally applicable in the same case today. Petitioners were afforded reasonable opportunity by Louisiana law to make objections to the manner of selecting and drawing both the grand jury and the petit jury. They failed to make such objections timely, and hence, as previously decided by the United States Supreme Court in this very case, they are now deemed to have waived those objections. If for no other reason, based upon the ruling of Michel v. State of Louisiana, supra, the writs herein prayed for should be denied. But there are other reasons calling for denial of the writs. Even though this Court is convinced that petitioners' objections to the make-up of the jury come too late, nevertheless, out of an abundance of caution, detailed testimony was taken concerning the composition of the petit jury involved and concerning the general practice in the past in the Parish of Orleans, State of Louisiana, in selecting and drawing juries. A review of this testimony convinces this Court that there is simply no merit to petitioners' contentions.

LSA–Revised Statutes 15:172 provides for the qualification of jurors as follows:

"The qualifications to serve as a grand juror or a petit juror in any of the courts of this state shall be as follows: To be a citizen of this state, not less than twenty-one years of age, a bona fide resident of the parish in and for which the court is holden, for one year next preceding such service, able to read and write the English language, not under interdiction or charged with any offense, or convicted at any time of any felony, provided that there shall be no distinction made on account of race, color or previous condition of servitude; and provided further, that the district judge shall have dis-

cretion to decide upon the competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case. In addition to the foregoing qualifications, jurors shall be persons of well known good character and standing in the community."

LSA–Revised Statutes 15:194 provides as follows:

"The said commissioners shall select at large, impartially, from the citizens of the Parish of Orleans having the qualifications requisite to register as voters, the names of not less than seven hundred and fifty persons competent under this Code to serve as jurors. A list of these names shall be prepared, certified to by the commissioners, and kept as a part of the records of their office subject to the orders of the judges of the criminal district court of said parish. The names on said list shall be copied on slips prepared for the purpose, with the number and address corresponding to that on the lists and shall be placed in the jury wheel from which the drawing is to be made. No name shall be canceled from said lists or withdrawn from the jury wheel without an order of court, and the said list shall be a correct and perfect record of the names in the jury wheel. The said list shall be supplemented from time to time as the necessities of jury service may require. No drawing shall be made from a list of less than seven hundred and fifty (750) names, unless in an extraordinary case when tales jurors are ordered by one of the judges of the criminal district court, said judge may, in his discretion, in order to avoid delay, order said drawings from a list and jury wheel containing not less than five hundred (500) names, and in such cases it shall be the duty of said [jury] commissioners immedi-

ately after said drawing to refill the said wheel and complete said list so as to reach the required number of seven hundred and fifty (750) names."

Petitioners do not contend that the procedures outlined in these Louisiana Statutes were not followed to the letter in the instant case. The main thrust of petitioners' argument boils down to a contention that because of the fact that a greater number of Negro citizens of New Orleans performed common labor than do white citizens, and because of the fact that the Court did, quite freely, grant exemptions from jury duty to laborers, that thus there resulted a systematic exclusion of Negroes from jury duty in Orleans Parish.

As part of the evidence introduced during the trial of this case, relators submitted certain figures regarding the jury venire lists of Orleans Parish from the years 1948 to 1953. The accuracy of these lists and the information contained therein were conceded by respondents. These lists showed a total jury venire list of 20,492 names, of which 718 were definitely Negroes, 10,816 definitely not Negroes, and the color or race of 8,958 was undetermined. As will be seen by reference to the Statutes quoted above, State law makes it illegal to make any distinction in the selection of jurors on account of race, color, or previous condition of servitude. Prior to 1953, there was no record kept on the index cards or jury lists pertaining to the race of the person named. However, as was pointed out during the trial of this matter, in 1953 the jury commissioners did begin keeping, in their official records, an indication as to the race of each prospective juror. When questioned about this practice, the Court was informed that prior to 1953, the jury commissioners were frequently called into Court to testify in connection with claims made by defendants that there had been a systematic exclusion of Negroes from the juries which had tried and convicted them, and the commissioners, who kept no record as to the race of prospective jurors, were

in the position of being unable to give any intelligent testimony as to whether or not persons whose names appeared on jury lists were white or colored. Consequently, in order to be able to defend themselves against such charges of discriminating against members of the Negro race, and in order to be able to give the Courts specific, concrete figures pertaining to the make-up of juries, the commissioners began, in 1953, to keep a record of the race of prospective jurors in order that accurate and adequate testimony might be available to the Courts when such claims were made. However, there was absolutely no indication of any kind from the testimony in this case, nor has it been seriously contended by petitioners herein that the jury commissioners in any way used this information in the selection of juries in Orleans Parish.

When making up a jury venire, the jury commissioner in Orleans Parish generally used the city telephone directory and the city directory, from which names were taken at random. By use of these sources, it was impossible to tell the race of the proposed juror. After the list was made up, subpoenas were then served on the person whose names had been selected, and these people were required to make personal return of the subpoena to the jury commission. At the time of his appearance, the prospective juror was questioned as to his qualifications to serve, and many were, at that stage, eliminated for failure to possess the required qualifications as set forth under Louisiana law. Those who did meet the qualifications had their names put in a jury wheel, which, when complete, contained at least 750 names. From this wheel, 150 names were picked at random to form a jury panel. The next 150 names were then selected to form the next jury panel, etc. Each of these jury panels, consisting of 150 names, were then sent to the different judges of the Criminal District Court in Orleans Parish. Any prospective juror whose name appeared in one of the jury panels could then, if he wished, consult personally with the judge to present the judge with a request for ex-

cuse, for legal cause, from jury duty. At that stage of the proceeding, the judge, in his discretion, granted or denied the request for relief from jury duty. The testimony in this case shows quite conclusively that at this stage of the proceedings, there was absolutely no discrimination of any kind based upon race or color of the prospective jurors.

The testimony did show that it was quite customary for both the jury commissioners and the judge to excuse from jury duty persons particularly who were engaged in common labor for a living. Jurors are not paid any fees in Orleans Parish, and consequently, in many cases, serving on a jury, either a grand jury or petit jury, would constitute a real hardship to a person of limited means and income. Thus, there were probably more common laborers excused from jury duty for this reason than any other class of people. However, there is no indication of any kind in this record that in granting excuses to common laborers any distinction whatsoever was made between the excuses granted to Negroes who were common laborers and whites who were common laborers. The testimony shows that in the great majority of the cases, it was the prospective juror himself who requested the relief from jury duty rather than the relief being instigated or suggested by the judge or the jury commissioner. Whenever the judge or the jury commissioners felt that it would be a real hardship, and particularly a financial hardship, for a person to serve as a juryman, his request for excuse from jury duty was seriously considered and generally granted. Thus, there was obviously no discrimination because of race or color resulting from this practice, nor was there any discrimination practiced against any class of people because of the type of work which they performed.

■■■■■ It is, of course, well settled that to exclude people from jury duty solely because of their race or color invalidates the whole jury venire. Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958). It is also well settled that a jury will be considered as having been improperly constituted if members of a certain race were included or excluded solely because of their race. Collins v. Walker, 329 F.2d 100 (CA5 1964). But in order for the exclusion of certain wage earners to constitute an illegal composition of a jury, the exclusion must be because they were "purposely excluded because they were of that class." Mamaux v. United States, 264 F. 816 (CA6 1920).

■■■ In the instant case, the excuses granted to common laborers were not granted because of the fact that the prospective jurors were engaged in common labor, but instead were granted solely because to force such persons to serve would subject them to an undue hardship. Such excuses, if not granted for some ulterior motive or purpose, were certainly lawful and within the contemplation of the Louisiana law pertaining to the selection of jurors. The evidence in this case dispels any suggestion that such excuses were made for any ulterior motive or purpose. On the contrary, the evidence shows quite clearly that the question of race in no way entered into the decision of the judge or the jury commissioners as to whether or not a request for relief from jury duty would be granted.

In the case of Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947), there was an allegation that "laborers, operatives, craftsmen, foremen and service employees were systematically, intentionally and deliberately excluded from the panel." In the course of finding that there was no evidence of discrimination in that case, the United States Supreme Court said:

"It is not unlikely that the requirements of citizenship, property and literacy disqualify a greater proportion of laborers, craftsmen and service employees than in some other classes. Those who are illiterate or, if literate in their own, are unable to speak or write the English language, naturally find employment chiefly in manual work. * * * We cannot overlook that one of the features which has tended to discredit jury

trials is interminable examination and rejection of prospective jurors. In a metropolis with notoriously congested court calendars we cannot find it constitutionally forbidden to set up administrative procedures in advance of trial to eliminate from the panel those who, in a large proportion of cases, would be rejected by the court after its time had been taken in examination to ascertain the disqualifications."

In United States v. Flynn, 216 F.2d 354 (CA2 1954), the question of the make-up of juries was also at issue. It was contended in that case that the practice used, whereby the jury clerk excused prospective veniremen on claims of financial hardship resulted in the excusing of three times as many manual workers as non-manual workers. It was contended that this constituted improper discrimination. The Court disagreed. In the course of its opinion it said:

"We agree with the District Court that this is entirely to be expected, since the financial burden of jury service obviously falls more heavily on those who are dependent for their livelihood upon a wage or salary which would be lost during absence from the job."

In the same case, the appellants contended that in excusing prospective jurors on the ground of financial hardship, the jury clerk was exercising a function delegated exclusively to the judiciary, and that thus, the jury clerk had no right to grant such excuses. Again the Court disagreed, saying:

"Surely, however, it could not have been the congressional intent that a judge should devote a large part of his time to hearing individual financial hardship excuses, most of which can be easily and effectively handled as an administrative matter. The practice under which these excuses are handled by the clerks appears to be contemplated by 28 U.S.C.A. § 1864, requiring the clerks to fill the jury box with names of 'qualified persons.' This language certainly implies that the jury clerks have discretion to omit persons as are not 'qualified' because of deafness or illness, for example. And we see no reason why such discretion should not extend to instances where the financial hardship of jury service might cause a prospective juror to worry or feel annoyed or resentful, and thus interfere with his effective service as a juror."

There is no difference between the contentions made by the appellants in the Flynn case and those made by petitioners herein. Petitioners herein contend that the excusing of certain laborers from jury duty by the jury commission and also by the judge constituted an unlawful discrimination against Negroes. This, they say, is so simply because in the New Orleans area there are more Negro laborers than white laborers and thus, in the usual course of events, the excusing from jury duty of laborers, who claim a financial hardship, results in excusing more Negroes than white persons, and there thus results an unlawful discrimination against Negroes. This argument, in view of the cases cited above, is untenable. The figures in this case actually show that of those jurymen whose race or color was determined, over six per cent were Negroes. Of the total number of names on the venire list, the color or race of forty-four per cent was undetermined. Thus, it would be safe to assume, that if the color of the forty-four per cent were determined, that many of those jurors were certainly of the Negro race, and thus, the percentage of Negroes actually on the jury venire list in New Orleans was something over six per cent. While the Negro population of Orleans Parish comprised about thirty-one per cent of the total population, of the non-white males of age 21 years, approximately twenty-nine per cent had from no schooling whatsoever to only six years. In the same generic group, at the age of 24 years, approximately thirty-one per cent had from no schooling to only six years. Approximately thirty-seven per

cent of the Negro work force in New Orleans were common laborers and approximately ten per cent of the total Negro work force were craftsmen such as bakers, blacksmiths, construction machinery operators, etc. Thus it will be seen that a large number of Negro prospective jurors would logically and necessarily be excused from jury duty in the regular administration of the State laws pertaining to the selection of juries, and this, without any systematic discrimination of any kind.

It is interesting to note the footnote contained in Fay v. People of State of New York, supra, 67 S.Ct. at page 1617, footnote 4. The Court said:

" * * * on the general jury panel * * * 11% are women. It is almost frivolous to assert that there is a bias against their inclusion on juries."

It would be safe to assume that in the City of New York, the female population would be not too far, one way or the other, from fifty per cent of the total population. But yet the Supreme Court in that case felt that it would be "almost frivolous" to assert that there was a bias against their inclusion on juries when eleven per cent of the jury panel were, in fact, women.

By the same token, in view of the testimony adduced at the trial of this case, and in view of the statistics introduced and filed herein, and in view of the sworn, unrebutted testimony of the various jury commissioners concerning the method used in selecting jurors in Orleans Parish, it is, in the opinion of this Court, "almost frivolous" to assert that there has been a bias in the Parish of Orleans, State of Louisiana, against the inclusion of Negroes on the jury panels of that parish.

It would serve no purpose in this opinion to go into detail into the many other statistical reports filed herein. Suffice to say that this evidence has been carefully studied and evaluated and it is the considered opinion of this Court that disproportions which exist between the races on the jury panels in Orleans Parish have resulted, as is clearly indicated, by the very testimony and evidence introduced herein by petitioners themselves, from a scrupulous adherence to the laws of the State of Louisiana, pertaining to the selection of juries as hereinabove set forth, which laws, as previously determined by the United States Supreme Court, are reasonable and constitutional in every respect. There has been no proof presented here of systematic exclusion of Negroes from the jury panels in New Orleans, and this Court now concludes that there is no merit to petitioners' contentions. Consequently, their application for the issuance of a writ of habeas corpus will be denied.